E. L. GAUDIN, Executor of the Estate of Margaret W. Gaudin, Deceased, Plaintiff-Appellant,

v.

KDI CORPORATION, Walter G. Cox, Charles F. Hartsock, Cors, Hair & Hartsock, Defendants-Appellees.

No. 76–2070.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 13, 1978.

Decided May 23, 1978.

Robert E. Manley, Cincinnati, Ohio, for plaintiff appellant.

Thomas S. Calder, Cincinnati, Ohio, for KDI and Cox.

Ralph F. Mitchell, Michael Maundrell, Douglas G. Cole, Cincinnati, Ohio, for Hartsock and firm.

Before WEICK, EDWARDS and ENGEL, Circuit Judges.

WEICK, Circuit Judge.

The action in the District Court was instituted by plaintiffs to recover compensatory and punitive damages for alleged fraudulent representations which caused them to enter into a contract with KDI Corporation (KDI) on or about April 8, 1970. The contract provided for an extension of a guarantee period with respect to a previous purchase of shares of stock, as consideration for which extension plaintiffs agreed to refrain from selling certain shares of stock for a period of time. The suit was brought under the authority of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, and related federal laws.

Pendent jurisdiction was claimed under the common law of Ohio relating to fiduciaries and malpractice by an attorney, with respect to defendant Hartsock and his law firm.

The District Court granted summary judgment in favor of the defendants, holding that plaintiffs' claim was not for the sale or purchase of shares of stock and therefore § 10(b) of the Act and Rule 10b–5 were not violated. The Court further held that the suit was barred by the applicable state statute of limitations. The plaintiffs appealed. We affirm.

I

The controversy grew out of the sale of assets of Herbert Chemical Company (Herbert), a corporation to KDI Corporation in exchange for shares of KDI stock and pursuant to a Reorganization Agreement entered into between KDI, Herbert and the plaintiffs.

After the sale was consummated on August 30, 1969 Herbert was dissolved, and 136,368 shares of KDI stock, which Herbert had received, were distributed to Herbert's shareholders. Plaintiffs, who were the controlling shareholders of Herbert, received 87,191 shares of KDI stock.

The 1969 Reorganization Agreement contained a guaranty protecting both plaintiffs and KDI from changes in the market price of KDI stock. The agreement contained three separate guaranties. With respect to 23,647 shares KDI promised to compensate plaintiffs by transferring additional shares if the market price of the stock was below $22 per share at the end of six months; and plaintiffs promised to return shares to KDI if the price was higher than $35 per share at the end of six months. A similar agreement protected an additional 23,647 shares for a period of one year if the market price was below $22 per share, or was higher than $40 per share. An additional 47,294 shares were protected for two years from the date of the agreement, with a low of $22 per share and a high of $50 per share.

By March 1, 1970 plaintiffs had decided to sell the 23,647 shares whose six-month guaranty had expired on that date. Plaintiffs alleged in their Complaint, and the District Court accepted *arguendo*, that they were dissuaded from selling their shares because of representations by defendants Cox and Hartsock, acting for KDI, that approval for the listing of KDI shares on the New York Stock Exchange had been given; that the actual listing was a mere formality which would take place within a very short time, but not later than June 30, 1970; and that the effect of plaintiffs' proposed sale of such a large block of stock might depress the market for said shares and might deprive shareholders of profits that could be made from the rise in value usually experienced by newly listed shares of stocks.

Plaintiffs contend that because of these representations they accepted defendants' promise, which the parties embodied in their written agreement of April 8, 1970, to reinstate its $22 price guaranty from that date until 150 days after the listing of KDI shares on the New York Stock Exchange. In exchange for this promise plaintiffs agreed to refrain from selling or offering for sale their shares until sixty days after such listing.[1]

Plaintiffs, received 80,668 additional shares of KDI stock in September, 1970 by exercising their rights under the second part of the guaranty (the one year provision).

In May, 1971 plaintiffs applied for and received 72,714 additional shares of KDI, which shares were issued under KDI's Plan of Arrangement under Chapter XI of the Bankruptcy Act. The Chapter XI proceeding was filed in Federal Court on December 30, 1970, in which proceeding the plaintiffs were listed in the schedules as having unliquidated or contingent claims as creditors, in an unknown amount. Instead of filing any claim for damages, the plaintiffs elected to come under the Plan of Arrangement as Class 6 creditors, and received additional shares of stock allotted to that class.

---

1. The Agreement is as follows:

AGREEMENT

THIS AGREEMENT made and concluded at Cincinnati, Ohio, this 8th day of April, 1970, by and between KDI CORPORATION, a corporation organized and existing under the laws of the State of Delaware, hereinafter sometimes referred to as "KDI," and E. L. GAUDIN and M. W. GAUDIN, sometimes hereinafter collectively referred to as "Gaudins,"

WITNESSETH:

THAT, WHEREAS, Gaudins are the owners of 87,197 shares of the Common Stock of KDI; and

WHEREAS, of the total number of shares of KDI Common Stock acquired by Gaudins, 23,647 shares were guaranteed by KDI to have a market value of $22.00 per share from September 1, 1969, to March 1, 1970, and such guarantee is no longer in effect; and

WHEREAS, Gaudins have indicated an interest in selling some or all of the aforesaid 23,647 shares of Common Stock of KDI, but have indicated a willingness to refrain from selling said shares provided KDI will extend the guarantee for a certain period of time,

NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter contained, the parties agree as follows:

1. Gaudins hereby promise and agree that they will refrain from selling, or offering for sale, 23,647 shares of Common Stock of KDI, said shares being the ones on which KDI had guaranteed the price to March 1, 1970, from the date of this Agreement to a period sixty (60) days after the listing of KDI Common Stock on the New York Stock Exchange, it being the mutual understanding of the parties that a formal listing application will be filed with the New York Stock Exchange by KDI not later than June 30, 1970.

2. In consideration of the foregoing, KDI hereby promises and agrees that it will extend the guarantee of a market value of $22.00 per share to the aforesaid 23,647 shares of KDI Common Stock for a period from the date of this Agreement to a date one hundred and fifty (150) days after the effective date of listing of the Common Stock of KDI Corporation on the New York Stock Exchange.

This Agreement shall be binding upon the heirs, devisees, legatees, executors, administrators, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, KDI Corporation has caused its corporate name to be hereunto affixed by its duly authorized President and Secretary, and E. L. Gaudin and M. W. Gaudin have hereunto set their hands all on the day and year first above written.

In the proofs of claim filed by plaintiffs in the Bankruptcy proceeding they asserted no claim for damages for fraud, but claimed only additional shares of stock in KDI, the debtor, based on the provisions of the Reorganization Agreement of 1969.

It is noteworthy that plaintiffs have not challenged the Reorganization Agreement nor made any claims of misrepresentation in connection therewith, nor have they challenged the stock values guaranteed in that agreement, nor challenged the 1969 sale of Herbert to KDI. They claim only to have been damaged by the misrepresentations as to the listing of said shares on the New York Stock Exchange, which alleged misrepresentations induced them to enter into the April 8, 1970 agreement.

The District Court held that the plaintiffs, by virtue of the April 8, 1970 agreement, did not purchase or sell any securities. The Court stated:

The undisputed facts of this case do not show any purchase or sale of any security in connection with the transaction in question. The plaintiffs complain that they were induced into signing the April 8, 1970, agreement by fraudulent statements made by defendants herein; and that pursuant to such agreement they did not sell the stock as to which the first part of the original warranty had expired. For the purposes of this jurisdictional inquiry, all that the defendants did was to extend a warranty, and all that the plaintiffs did was agree not to sell their stock.[6] There was no purchase, and

[6] One might argue, from a logical perspective, that a successful inducement to retain stock or to not sell stock is similar to a successful inducement to purchase stock; and that since the latter inducement, if fraudulent, is actionable, the former should not be barred. The Supreme Court, however, has foreclosed this line of argument. In the *Blue Chip Stamps* case the United States Court of Appeals for the Ninth Circuit, before the appeal to the Supreme Court, held in favor of the argument put forth above citing decisions from several Circuits. *Manor Drug Stores v. Blue Chip Stamps*, 492 F.2d 136, 140 (9th Cir. 1973), rev'd. 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539. The Supreme Court ruled against this argument specifically, based primarily upon the difficulties inherent in the nature of proof necessary to sustain a claim that one had not purchased stock due to a fraudulent misrepresentation. See: 421 U.S. at 744–749, 95 S.Ct. 1917 for the Supreme Court's analysis here.

no sale. There are only two operative sentences in the agreement. The first is that the Gaudins "promise and agree that they will refrain from selling . . ." and the second is that KDI "promises and agrees that it will extend the guarantee of a market value of $22.00 per share . . . ." To the extent that the agreement is anything other than a guarantee extension, it is a promise not to sell. There is no aspect of the transaction in question that qualifies the plaintiffs herein as purchasers or sellers of securities. Accordingly, this Court lacks jurisdiction and this complaint must be dismissed. [A. 475–76]

In reaching its decision the District Court followed the *Birnbaum* rule, *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), as applied by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and by this Court in *Marsh v. Armada Corp.*, 533 F.2d 978 (6th Cir. 1976).

In our opinion the District Court correctly applied these decisions.

## II

■ The Securities Act contains no statute of limitations. We are therefore required to apply the state statute of limitations which best effectuates the policy of the federal statute in question. *AFL–CIO v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). Ohio has two statutes to be considered. Ohio Rev. Code § 1707.43 contains a limitation of two years for bringing an action for violation of Ohio's Blue Sky Laws. Ohio Rev.Code § 2305.09(C) is a four year statute of limitations applicable to general fraud.

■ In *Nickels v. Koehler Management Corp.*, 541 F.2d 611 (6th Cir. 1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), we held, in an opinion

written for the Court by Circuit Judge Wade McCree, that the four year statute of limitation was the most appropriate statute to apply. We will follow that decision by adopting the time period therein contained. We will, however, apply federal law that determines when a statute of limitation begins to run, which is when "the fraud is or should have been discovered." *Vanderboom v. Sexton*, 422 F.2d 1233, 1240 (8th Cir. 1970).

■ Federal law applies in determining the date on which the statute of limitation begins to run. *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Bailey v. Glover*, 88 U.S. 342, 22 L.Ed. 636 (1875); *Hupp v. Gray*, 500 F.2d 993 (7th Cir. 1974).

In *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402 (2d Cir. 1975), the Court pointed out indicia of when fraud should be discovered, as follows:

> In light of the trading suspensions, the precipitous decline in the price of CUC stock, and the other lawsuits by the SEC and private parties, we think that Judge McFadden correctly concluded that plaintiffs with reasonable diligence could and should have discovered the alleged fraud prior to December 15, 1969. [*Id.* at 410]

The District Court similarly pointed out the indicia existing in the present case:

> Plaintiff's [*sic*] complaint cites several instances where the plaintiffs were advised that the KDI stock was "very shortly to be listed on the New York Stock Exchange," and "the listing was a mere formality and would be accomplished within a short period of time." KDI stock was never listed on the New York Stock Exchange. KDI filed bankruptcy in December of 1970, only nine months after the April 8, 1970, agreement. In light of the glowing promises allegedly made by the defendants, the fact that the stock was never listed on the New York Stock Exchange should have put the plaintiffs on notice that something was wrong.
>
> As to the relative values of the stock during the time in question on the over-the-counter market, defendant Hartsock's Exhibit M is quite eloquent.

OVER–THE–COUNTER QUOTATIONS KDI CORPORATION EAST COAST EDITION— WALL STREET JOURNAL

| Market Date | Journal Date | Bid | Asked |
|---|---|---|---|
| 4/1/70 | 4/2/70 | 18.50 | 19.25 |
| 5/1/70 | 5/4/70 | 12.25 | 13.25 |
| 6/1/70 | 6/2/70 | 11.00 | 11.50 |
| 7/1/70 | 7/2/70 | 6.38 | 6.88 |
| 8/3/70 | 8/4/70 | 6.75 | 7.25 |
| 9/1/70 | 9/2/70 | 4.50 | 4.75 |
| 10/1/70 | 10/2/70 | 5.00 | 5.50 |
| 11/2/70 | 11/3/70 | 3.12 | 3.38 |
| 12/1/70 | 12/2/70 | 2.50 | 2.75 |

Hartsock Exhibit M.

> In eight months KDI dropped from the $18–$19 range to the $2.50–$2.75 range. The plaintiffs were aware of this situation, or they should have been, in the exercise of due diligence. It is inconceivable that plaintiffs took no notice of a drop in stock value from in excess of $400,000 to less than $60,000.00. The nature of the decline in the stock value should have put the plaintiffs on notice that something was wrong.
>
> A consideration of the third indicia, that of other lawsuits, reveals that during the time in question there were five separate lawsuits brought against KDI for violations of the federal securities laws. The plaintiffs were aware of these lawsuits. The plaintiffs' awareness of the existence and the nature of these lawsuits was also notice that something was wrong.
>
> In light of the failure of KDI stock to be listed on the New York Stock Exchange between April, 1970, and December, 1970, the precipitous and steady decline in the price of the KDI stock sold over-the-counter during the same period, and other lawsuits filed prior to the December 21, 1970, meeting, the plaintiffs with reasonable diligence could and should have discovered the alleged fraud prior to January of 1971. The Court holds that as a matter of law the statute of limitations applicable herein began to run on December 31, 1970. The com-

plaint herein was not filed until May 15, 1975, more than four years later, and five and a half months after the time for filing had expired. Accordingly, the Court holds that the complaint was not timely filed, and that the defendants herein are entitled to judgment.[2] [A. 479–81]

In our opinion these indicia were supported by the uncontroverted evidence in this case, including the admissions of Mr. Gaudin, as hereinafter set forth.

The plaintiffs, who were husband and wife, were not novices. They were the principal shareholders of Herbert, and were responsible for its organization and success.

E. L. Gaudin wrote a letter to his son, Dean Gaudin, on September 3, 1974. The following are excerpts taken from his letter:

On March 25, 1969, Chas Hartsock wrote to me and suggested we consider selling to KDI. Chas was also a director and secretary treasurer of KDI. We received such glowing reports and financial statements on KDI that we became enthused with the future potential. As we now look back, I question the accuracy of some of the information given to us and believe now, that in 1970 we should have entered a recision [*sic*] suit against KDI. This action I was then advised not to do. Possibly it is not too late to do so now? KDI particularly appealed to you, Jim Harrington and me because we were assured of complete freedom to operate Herbert Chemical without any interference from KDI. Of course, as you know, this assurance has not been kept. Under the terms of sale September 1, 1969, we received a *guaranteed* price of approximately $2,800,000.00. Before selling to KDI, you, Jim Harrington and I were on a remuneration arrangement of salary, plus bonus approximately equal to our salary. Effective September 1, 1969, Jim's salary and yours were approximately doubled, without bonus, so that your total remuneration would be the same. In my case I was so enthusiastic about the large amount of assured money that I was going to get from the sale, that I elected to continue on my salary and of course, there would be no bonus. This salary was just 50% of what it would have been if I had gone along on the same basis you and Jim did.

I remember in August 1970, dark clouds started to form regarding the financial situation at KDI. I was in San Diego at the time and become so concerned that I telephoned Chas Hartsock who was in Chicago. Chas assured me that there was not the slightest danger of KDI going into bankruptcy. I am sure this was his honest opinion at that time.

In December 1970, KDI went into bankruptcy.

Then I realized the stock was in great jeopardy and my large interest in KDI could be worthless.

When this happened the company was in no position to increase my salary to what it should have been and later it could not be done because of price and wage controls.

On January 1, 1973, KDI changed our pension plan to salary of that date. The fact that my salary was only 50% of what it should have been, had no bearing on the retirement that I would receive. [A. 288–89]

In applying the rule requiring the exercise of reasonable care to discover the alleged fraud, we must assume that E. L. Gaudin was at least a person of ordinary intelligence. He knew that the shares of KDI were not listed on the New York Stock Exchange by June 30, 1970, the date represented for the listing. He could easily have learned the reason therefor by inquiry. The reason was that the total number of KDI shares available for trade did not meet the listing qualification requirement of the Exchange, which requirement amounted to 14,000,000 shares.

We also believe that Mr. Gaudin, because of his ownership of such a large number of KDI shares, was cognizant of the drop in

---

**2.** The Complaint was actually filed four and one-half months late.

the value of the shares on the over-the-counter market, from $18.50 bid and $19.25 asked for, per share, on April 1, 1970, to $2.50 bid and $2.75 asked for on December 1, 1970. He knew, of course, that KDI, on December 30, 1970, filed a petition in Bankruptcy Court under Chapter XI for Arrangement. During this time Gaudin was represented by lawyers other than those whom he has sued.

Despite all the indicia above pointed out, Mr. Gaudin claims that he did not discover until 1974 the alleged fraudulent representation concerning the listing on the New York Stock Exchange.

The District Court was correct in holding, from the uncontroverted evidence, that Mr. Gaudin could reasonably have discovered the alleged fraud by December 31, 1970.

It is also noteworthy that Mr. Gaudin and his wife did not file proof of claim for damages in the Chapter XI proceeding, but made their claim solely for additional shares of stock based on the Reorganization Agreement. They have received and accepted the additional shares to which they were entitled under the Plan of Arrangement approved in the Chapter XI proceeding.

In our opinion the District Court correctly held that the four year statute of limitations commenced to run on December 31, 1970, and that this action was barred because it was not commenced within the four year time period. The District Court was correct also in not assuming pendent jurisdiction over the other claims.

The judgment of the District Court is affirmed.