**J. Scott CAMPBELL, Plaintiff,**

v.

**The UPJOHN COMPANY, Defendant.**

**No. K78–23 CA4.**

United States District Court,
W. D. Michigan, S. D.

Sept. 30, 1980.

Richard C. Walsh, Kalamazoo, Mich., Robert J. Sokolowski, New Haven, Conn., for plaintiff.

William J. Doyle, New Haven, Conn., Thomas G. Parachini, Kalamazoo, Mich., for defendant.

## OPINION

BENJAMIN F. GIBSON, District Judge.

On November 6, 1969, plaintiff J. Scott Campbell ("Campbell") entered into an agreement with the defendant ("Upjohn") which, among other things, provided for the exchange of his shares of Homemakers, Inc. ("Homemakers") for those of Upjohn. Campbell initiated this lawsuit in Connecti-

cut Superior Court on October 31, 1975, alleging that the agreement violated section 17 of the Securities Act of 1933, 15 U.S.C. § 77q, section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and the Security and Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5 (1979). The case was removed to the United States District Court for the District of Connecticut, and subsequently transferred to this District upon stipulation of the parties. Arguing that the expiration of the limitations period bars this action, the defendant has moved to dismiss the complaint and for summary judgment. The Court is of the opinion that the plaintiff did not timely bring suit after he should have learned of his cause of action, and so grants the defense motion for summary judgment.

## I. BACKGROUND

Homemakers in 1969 was a small but aspiring provider of home health care services. Believing that its growth potential was restricted by insufficient liquid capital, Homemakers' management (plaintiff Campbell as Sales Director, and Edward Wilsmann as President) sought to ally the company with a larger and richer firm. Negotiations commenced with Upjohn in June of 1969 culminated in the complained of merger agreement, dated October 31, 1969 but in reality signed on November 6, 1969, Campbell alleges that the merger agreement omitted numerous provisions that had been "material inducements" to his assent, and so was the product of misrepresentation. Moreover, he asserts that he was not informed of the changes in the operative documents, neither read nor received a copy before affixing his signature, and signed only under duress "coldly calculated to destroy my will ... at a time that [sic] I was without counsel."[1] More Definite Statement, ¶ 29.

Merger discussions between Homemakers and Upjohn perforce involved three major matters: the terms of integration; Homemakers' operation with the Upjohn organi-

---

1. Although parts of the More Definite Statement are phrased in the first person, Campbell has been represented by retained counsel from the outset of this action.

zation; and the future role to be played by Homemakers' officers and executives. Campbell alleges that the terms of the final agreement vary from Upjohn's representations in all three areas. The Plan and Agreement of Merger (hereinafter the "Agreement") contains a standard integration clause. Agreement § 9.6.

The transfer of corporate control was effected by the "front end" exchange of 225 shares of Upjohn common stock then trading at about $45, for each share of Homemakers stock. Agreement § 3.1(b). (Campbell held 11 shares of Homemakers stock; Wilsmann 45; and one Ernest Wunderlich, who founded the company, 35.) This ratio apparently remained constant during negotiation, and Campbell admits that he duly received 2,475 shares of Upjohn stock. Campbell claims, however, that the transaction was to be structured as a tax–free Type "B" merger, and that loans from Upjohn to Homemakers destroyed eligibility under the Tax Code. I.R.C. § 368(a)(1)(B). More Definite Statement ¶¶ 13 & 37.

Campbell also alleges that additional compensation was promised him by means of "back end" payments. It appears that two basic formulas for computing such delayed compensation were discussed. The first appears in a written proposal from Upjohn to Homemakers dated June 19, 1969 and attached to the More Definite Statement as Exhibit "B." It called for Campbell and Wilsmann to purchase 5.4% interests in the successor corporation in return for six shares each of Homemaker stock, and granted Upjohn the option to buy out the 5.4% interests at twenty times the average annual earnings per share after five years. According to Campbell, Upjohn represented that it would commit itself to buy out the 5.4% interests, extending the time for doing so, if necessary to ensure that the "back end" payment at least equalled the "front end"–17,775 shares of Upjohn stock at 1969 value. The second formula is set forth in a letter from Upjohn to Homemakers dated August 11, 1969. This second communication, attached to the More Definite Statement as Exhibit "A," states that discussions conducted since June 19, 1969–

the date of the first written proposal–"have indicated that the structure of our proposal be altered." It then calls for Wilsmann and Campbell to enter into "incentive five year employment agreements" which would carry an annual bonus equal to 21.6% of net Homemaker earnings in excess of $14,310. Wilsmann's Employment Agreement incorporates this second formula, although the net earnings floor was lowered to $12,150. ¶ 3(b), at 2. The final merger documents made no mention of the first formula, and did not provide for an "incentive employment agreement" with Campbell.

Campbell further alleges that Upjohn conducted the Homemakers operation in a manner which reduced net earnings, and so the amount available for "back end" payments under either formula. He claims that, contrary to its representations, Upjohn used substantial debt financing of Homemakers, and deducted the interest in calculating net earnings, ¶ 34; did not establish an "in–house" financing company to assist Homemakers and boost its earnings, ¶ 36; failed to devote its large pharmaceutical sales force to promoting Homemakers' services, ¶ 33; and in many other particulars failed to calculate net earnings "in a reasonable and good faith manner." More Definite Statement ¶ 39.

Perhaps most upsetting of all to the plaintiff was his exclusion from post–merger employment with the Homemakers successor corporation. He was constantly assured during negotiations, of his continuing role as an executive, he claims, but Upjohn representatives abruptly demanded and secured his resignation at the closing. "Stunned because Upjohn had turned a moment of personal triumph into one of shame and humiliation before their audience, I signed everything Defendant Upjohn asked me to without hesitating again." Campbell Aff. ¶ 6. The Agreement as Campbell signed it provided for an incentive employment agreement only with Wilsmann. Without such an arrangement, Campbell would receive no bonus payments as described in the August 11, 1969 letter and in Wilsmann's employment agreement.

Upjohn responds that the complaint on its face shows that Campbell's cause of action for securities fraud[2] accrued on November 6, 1969, and that he failed to initiate suit within the applicable two year limitations period. Campbell rejoins that the running of the statutory period was suspended by Upjohn's concealment of the original fraud until it was actually discovered by reading the merger documents in June of 1975, only four months before suit was filed. Campbell claims that he failed to read the merger agreement when he signed it because 1) he presumed that the merger terms had not changed over the four and half months of negotiation, Campbell Dep. at 58–59, 75; Campbell Aff. at ¶ 7; 2) he had been assured up to the last moment that his employment contract and "back end" payments were included, Campbell Dep. at 60; and 3) he was shocked by his sudden, unexpected, forced resignation into passive accession to all documents laid before him for signature. Campbell Aff. at ¶ 6. He explains his failure to read the merger documents during the subsequent 69 months as the result of 1) continual assurances by Upjohn officers and agents that his "back end" payment would be forthcoming in July, 1975, Campbell Aff. ¶ 11; Campbell Dep. at 71, 73; and 2) the psychic trauma of his forced resignation which caused physical and mental illness that prevented his discovery of the alleged fraud. Campbell Aff. ¶ 8.

## II. STATUTE OF LIMITATIONS

■ The provisions of the securities laws here involved contain no limitations period. The Court thus looks to the state statute of · limitations that best effectuates the policy they promote. *Ernst & Ernst v. Hochfeld-*

er, 425 U.S. 185, 210 n.29, 96 S.Ct. 1375, 1389 n.29, 47 L.Ed.2d 668 (1976); *Gaudin & KDI Corp.*, 576 F.2d 708, 711 (6th Cir. 1978); *I.D.S. Progressive Fund, Inc. v. First of Michigan Corp.*, 533 F.2d 340 (6th Cir. 1976). This case was transferred from the District of Connecticut, and the limitations period must be found in that State's laws. *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 820, 11 L.Ed.2d 945 (1964); *H. L. Green Co. v. MacMahon*, 312 F.2d 650 (2nd Cir. 1962) *cert. denied*, 372 U.S. 928, 83 S.Ct. 876, 9 L.Ed.2d 736 (1963). The parties are correctly agreed that the applicable statute in this case is Conn.Gen.Stat. § 36–346(e),[3] which requires that all actions involving securities sales contracts be brought within two years of the exchange.[4] *Gannett Co. v. Register Publishing Co.*, 428 F.Supp. 818 (D.Conn.1977); *Long v. Abbott Mortgage Corp.*, 424 F.Supp. 1095 (D.Conn.1976); *Hitchcock v. deBruyne*, 377 F.Supp. 1403 (D.Conn.1974).

■ State law provides no more than the limitations period; when the cause of action accrues, the date the statute begins to run, and the circumstances that toll it, are determined under the federal common law. *Gaudin v. KDI Corp.*, 576 F.2d 708, 711 (6th Cir. 1978). The general rule is that a limitation period begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged fraud. *N. L. R. B. v. Don Burgess Construction Corp.*, 596 F.2d 378, 382, (9th Cir.) *cert. denied*, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). A securities plaintiff cannot rely on his mere unawareness of fact or law to toll the statute, *Hupp v. Gray*, 500 F.2d 993, 997 (7th Cir. 1974); nor, in the oft quoted language of *Klein v. Bower*, 421 F.2d 338, 343

---

2. The alleged events might support claims for relief under theories of common law fraud and breach of oral contract, but Campbell has elected to proceed only under the federal securities law.

3. Conn.Gen.Stat. § 36–346(e) was repealed by Conn.Pub.Act 77–482 § 21, but it is applicable to all cases filed before October 1, 1977. *Dandorph v. Fahnestock & Co.*, 462 F.Supp. 961, 963 n.4 (D.Conn.1979).

4. The Court notes that in Michigan, where this case could have been brought and where it has been transferred for trial, securities fraud actions are subject to a six year statute of limitations. *IDS Progressive Fund, Inc. v. First of Michigan Corp.*, 533 F.2d 340, 344 (6th Cir. 1976); *Smillie v. Park Chemical Co.*, 466 F.Supp. 572, 575 (E.D.Mich.1979).

(2d Cir. 1970), does the statute await his "leisurely discovery of the full details of the alleged scheme." Instead, once he has, or ought to have, knowledge of facts from which wrongdoing could reasonably be inferred, he must attempt to ferret out the whole truth. *Cook v. Avien, Inc.*, 573 F.2d 685, 698 (1st Cir. 1978) ("Storm warnings" commence running of statute); *Friedman v. Meyers*, 482 F.2d 435 (2d Cir. 1973). "Those who have learned of facts 'calculated to excite inquiry' must inquire." *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1171 (5th Cir. 1979) (citation omitted). In order to determine when the statutory period began to run, the Court must conduct a two–step inquiry: "first, it must determine those facts which the plaintiffs knew [of] or in the exercise of due diligence should have known; and, second, it must determine whether those facts gave the plaintiffs notice of the fraudulent activities complained of." *First Federal Savings & Loan Assoc. v. Mortgage Corp. of the South*, 467 F.Supp. 943, 954 (N.D.Ala.1979).

■ "Reasonable diligence" is an objective standard that requires behavior of the sort expected of the well–known "reasonably prudent person." *McNeal v. Paine, Webber, Jackson & Curtis, Inc.*, 598 F.2d 888, 893 n.11 (4th Cir. 1979); *In re Commonwealth Oil/Tesoro Petroleum Litigation*, 484 F.Supp. 253, 257 (W.D.Tex.1979); *First Federal Savings & Loan Assoc. v. Mortgage Corp. of the South*, 467 F.Supp. 943, 953 (N.D.Ala.1979); *Long v. Abbott Mortgage Corp.*, 424 F.Supp. 1095 (D.Conn. 1976). Like the standard of care in tort, it must be determined "solely under the peculiar circumstances of each case." *de Haas v. Empire Petroleum Co.*, 435 F.2d 1223, 1226 (10th Cir. 1970), quoting, *Tobacco & Allied Stocks, Inc. v. Transamerica Corp.*, 143 F.Supp. 323, 331 (D.Del.1956) aff'd, 244 F.2d 902 (3rd Cir. 1957). Many factors may be relevant to this inquiry:

> The Concept of due diligence is not imprisoned within the frame of a rigid standard; it is protean in application. A fraud which is flagrant and widely publicized may require the defrauded party to make immediate inquiry. On the other hand, one artfully concealed or convincingly practiced upon its victim may justify much greater inactivity. The presence of a fiduciary relationship or evidence of fraudulent concealment bears heavily on the issue of due diligence.

*Azalea Meats, Inc. v. Muscat*, 386 F.2d 5, 9 (5th Cir. 1967) (footnote omitted). *Accord, Hupp v. Gray*, 500 F.2d 993, 997 (7th Cir. 1974); *Morgan v. Koch*, 419 F.2d 993, 997 (7th Cir. 1969).

■ The statute of limitations may be tolled if a plaintiff did not timely initiate suit because of ignorance resulting from a defendant's fraudulent concealment of the underlying facts. This equitable doctrine is read into every federal statute of limitations, *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946), including those applicable to the securities laws. *Morgan v. Koch*, 419 F.2d 993, 997 (7th Cir. 1969). In order to be granted this dispensation, a plaintiff must plead three elements with particularity: 1) wrongful concealment of their actions by the defendants; 2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and 3) plaintiff's due diligence until discovery of the facts. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975). Since the doctrine is in avoidance of the statute of limitations, the plaintiff seeking to benefit from it must carry the burden of proof to establish each element. *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230, 233 (6th Cir.) cert. denied, 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974) (antitrust action); *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir. 1978) (securities action); *Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir. 1974) (same).

■ The relationship between the elements of the fraudulent concealment doctrine is indicated by the Sixth Circuit's *conjunctive* listing. First, both active attempts to conceal and due diligence to uncover must be present. *Accord, Hernandez Jimenez v. Calero Toledo*, 604 F.2d 99, 101 (1st Cir. 1979); *Hupp v. Gray*, 500 F.2d 993, 996

(7th Cir. 1974). Were the former requirement to exempt the plaintiff from the latter, some suits which could be sooner brought would instead go stale, thwarting the purpose of the limitations period.[5] Second, the attempts at concealment must frustrate discovery of the fraud despite the plaintiff's diligent efforts to uncover wrongdoing. *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1169 (5th Cir. 1979); *Bruno v. United States*, 547 F.2d 71, 74 (8th Cir. 1976); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2nd Cir. 1974); *Clark v. United States*, 481 F.Supp. 1086, 1095 (S.D.N.Y.1979); *Roberts v. Magnetic Metals Co.*, 463 F.Supp. 934, 945 (D.N.J. 1978).[6] "If this were not so, there would be, in effect, no statute of limitations on any fraud action." *Id.* Moreover, if the plaintiff could have discovered his cause of action through due diligence, there is no reason to grant him more time in which to act. It follows that the plaintiff's reliance on any of the defendant's concealing representations must be *reasonable*. *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978).[7] In short, the plaintiff is not excused from his duty of diligence merely because the defendant, having once defrauded him, attempts to cover it up. The presence of fraudulent concealment is a factor to be taken into account in determining when a plaintiff should have discovered the fraud, but it does not *ipso facto* postpone that date until a smoking pistol is chanced across. *See Osterneck v. E. T. Barwick Industries, Inc.*, 79 F.R.D. 47, 52 (N.D.Ga.1978).

 The required acts of concealment cannot be found in the original fraud itself. If they could, the statute of limitations in fraud cases would be tolled indefinitely pending the plaintiff's actual discovery of his cause of action. "Fraud is always concealed. If it was not, no fraud would ever succeed." *Smith v. Blachley*, 198 Pa. 173, 47 A. 985, 987 (1901), *quoted in Goldstandt v. Bear, Stearns & Co.*, 522 F.2d 1265, 1267 (7th Cir. 1975). Thus, the plaintiff must identify affirmative acts of concealment continuing after the original fraud was completed. *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 249 (9th Cir. 1978); *Sperry v. Barggren*, 523 F.2d 708, 711 (7th Cir. 1975). "[F]raudulent concealment tolls a statute of limitations only for as long as the concealment endures. . . . If the [plaintiff] actually knew, or by the exercise of due diligence should have known about the alleged [wrong], the statute would not be tolled," *N. L. R. B. v. Don Burgess Construction Co.*, 596 F.2d 378, 383 (9th Cir.) *cert. denied*, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979) (citation omitted). (Of course, the manner in which a defendant constructed the original scheme will bear upon how quickly a plaintiff would discover the fraud in the exercise of due diligence.) Absent the special circumstances of a fiduciary relationship, the mere denial of wrongdoing does not constitute active concealment, *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978); *Dayco Corp. v. Firestone Tire & Rubber Co.*, 386 F.Supp. 546, 549 (N.D.Ohio 1974) *aff'd*, 523 F.2d 389 (6th Cir. 1975); nor does the mere failure to disclose the existence of a cause of action. *Kansas City v. Federal Pacific Electric Co.*, 310 F.2d 271, 278 (8th Cir.) *cert. denied*, 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962);

5. There has been some uncertainty on this point in other circuits. See the scholium in *Long v. Abbott Mortgage Corp.*, 459 F.Supp. 108, 118 n.7 (D.Conn.1978).

6. Some opinions have held that attempts to conceal work a sort of estoppel against the defendant, and indefinitely toll the statute pending the plaintiff's actual discovery of the fraud, without regard to the plaintiff's due diligence, *Robertson v. Seidman & Seidman*, 609 F.2d 583, 593 (2nd Cir. 1979); *Sperry v. Barggren*, 523 F.2d 708, 711 (7th Cir. 1975); *Rut-

*ledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250–51 (9th Cir. 1978) (Merrill, J., dissenting); *Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 472 F.Supp. 402, 406–07 (D.Colo. 1979).

7. Reasonable reliance is of course a required element in actions for fraud and misrepresentation at common law. *See, e. g., Renz v. Beeman*, 589 F.2d 735, 751 (2nd Cir. 1978) *cert. denied*, 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1980).

*Dayco Corp. v. Firestone Tire & Rubber Co.,* 386 F.Supp. 546, 549 (N.D.Ohio 1974) *aff'd,* 523 F.2d 389 (6th Cir. 1975).

## III. THE STATUTE OF LIMITATIONS DEFENSE AT THE PLEADINGS STAGE

Campbell filed his complaint in Connecticut Superior Court on October 31, 1975, and thereby tolled further running of the two–year statute of limitations. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 467, 82 S.Ct. 913, 916, 8 L.Ed.2d 39 (1962). In order to maintain this action, Campbell must have been unable to become aware of his cause of action in the exercise of due diligence before October 30, 1973, unless the statute was tolled by the defendant's fraudulent concealment.

 Although the statute of limitations defense is not among those enumerated in Fed.R.Civ.P. 12(b), it is settled that the defense may be raised upon motion to dismiss for failure to state a claim upon which relief can be granted under Fed.R. Civ.P. 12(b)(6) as well as upon a motion for summary judgment under Fed.R.Civ.P. 56. *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir. 1980); *Rauch v. Day & Night Manufacturing Corp.,* 576 F.2d 697, 702 (6th Cir. 1978). The former is appropriate when "the time alleged in the complaint shows that the action was not brought within the statutory period." *Id.* Allegations of fraudulent concealment, plead with the particularity required by Fed.R.Civ.P. 9(b), will suffice to defeat a motion to dismiss under the benevolent reading of the complaint required by Rule 12(b)(6). *See Davis H. Elliot Co. v. Caribbean Utilities Co.,* 513 F.2d 1176, 1182 (6th Cir. 1975). If the defense is not apparent on the face of the complaint, it may still be raised by a motion to dismiss accompanied by affidavits or other evidentiary matter. *Jablon v. Dean Witter,* 614 F.2d 677, 682 (9th Cir. 1980); *Rauch v. Day & Night Manufacturing,* 576 F.2d 697, 702 (6th Cir. 1978). Such a motion may be considered tantamount to one for summary judgment. Fed.R.Civ.P. 12(b)(6). In light of the extensive extra–pleading material laid before the Court, as well as the defendant's alternative motion for dismissal or summary judgment, the Court will treat the pending motion as if for summary judgment under Rule 56.

 Despite the heavy burden placed upon the plaintiff seeking to avoid the statute of limitations by reliance on the doctrine of fraudulent concealment, it is the defendant who has the more difficult labor in the instant procedural context. In order to merit the grant of summary judgment under Rule 56(c), Upjohn must bear the burden of clearly establishing the non–existence of any genuine issue of fact material to a judgment in its favor. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. Articles of Device . . . Diapulse,* 527 F.2d 1008, 1011 (6th Cir. 1976). In determining whether or not there are issues of fact that must be determined at trial, "the inferences to be drawn from the underlying facts contained in [the] [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425 (6th Cir. 1962). Even if the basic facts are not in dispute, summary judgment is not appropriate if contrary inferences may be drawn from them. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *E. E. O. C. v. United Association of Journeymen, Local 189,* 427 F.2d 1091, 1093 (6th Cir. 1970). To obtain summary judgment on the ground that the statute of limitations has expired, then, Upjohn must demonstrate that no material fact or inference suggests that Campbell should not have realized his cause of action before October 31, 1973. *Roberts v. Magnetic Metals,* 463 F.Supp. 934, 943 (D.N.J.1978), and cases cited therein.

Because the limitations problem turns on the effect that facts actually or constructively known to Campbell should have had on a reasonable person, it is particularly

suited to determination at trial. *Tomera v. Galt*, 511 F.2d 504, 510–11 (7th Cir. 1975); *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir. 1973). Indeed, it has been suggested that summary judgment on the statute of limitations may never be appropriate where factual questions of mental state are involved. *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168, 172 (10th Cir. 1974). It is generally held that summary judgment on the question is warranted only when the material facts are admitted or established beyond dispute, *see, e. g., Sleeper v. Kidder, Peabody & Co.*, 480 F.Supp. 1264, 1265 (D.Mass.1979). Yet, even under these severe conditions, the cases are legion in which summary judgment has been granted on the ground that the plaintiff should have discovered his cause of action under the securities law before the statute of limitations had run. *See Gaudin v. KDI Corp.*, 576 F.2d 708 (6th Cir. 1978); *Stull v. Bayard*, 561 F.2d 429 (2d Cir. 1977) *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978); *Arneil v. Ramsey*, 550 F.2d 774 (2nd Cir. 1977); *Schaefer v. First National Bank of Lincolnwood*, 509 F.2d 1287 (7th Cir. 1975); *Klein v. Bower*, 421 F.2d 338 (2d Cir. 1970); *Sleeper v. Kidder, Peabody & Co.*, 480 F.Supp. 1264 (D.Mass.1979); *Humphrey v. J. B. Land Co.*, 478 F.Supp. 770 (S.D.Tex. 1979); *Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 472 F.Supp. 402 (D.Colo.1979); *First Federal Savings & Loan Assoc. v. Mortgage Corp. of the South*, 467 F.Supp. 943 (N.D.Ala.1979); *Herm v. Stafford*, 455 F.Supp. 657 (W.D.Ky.1978); *Osadchy v. Gans*, 436 F.Supp. 677 (D.N.J.1977); *In re Alodex Corp. Securities Litigation*, 392 F.Supp. 672 (S.D.Iowa 1975) *aff'd*, 533 F.2d 372 (8th Cir. 1976).

## IV. THE STANDARDS APPLIED

■ The Court will assume that Campbell's original Complaint, as supplemented by his More Definite Statement, adequately sets forth the three elements of fraudulent concealment required by *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975): 1) affirmative acts of the defendant 2) which prevented the plain-

tiff from timely discovery of the operative facts 3) despite his due diligence to learn them. Evidentiary material bearing on these factual questions—Campbell's affidavit and deposition, the merger Agreement, various communications—have been presented to the Court without challenge or contradiction. Upjohn insists that the undisputed facts these materials contain suffice to justify summary judgment in its favor; Campbell pleads that they bear inferences which require determination at trial. The issue is simply whether the facts establish that Campbell should have learned of the alleged scheme and brought suit before October 31, 1973. The Court is of the opinion that they do.

### A. What Campbell Knew

Whatever else may have eluded Campbell's awareness, he knew the day the Agreement was signed that he would not be employed by the Homemakers successor corporation. He was sharply aware that this was a deviation from the representations on which he claims to have relied. Indeed, he traces his subsequent docility to the shock of his forced resignation. He also knew by 1971 at the latest that all eleven of his Homemakers shares had been exchanged for Upjohn stock, because he then realized some difficulty prying loose the Upjohn shares from an escrow account. Campbell Aff. ¶ 11; Campbell Dep. at 69–71. In that year he "did end up with a release of those escrow shares." *Id.* at 71–72. He was aware of the superseding proposal of the August 11, 1969 letter, but believed it was solely to confuse Wonderlich. *Id.* at 54.

### B. What Campbell Should Have Known

Above all and before all else, Campbell should have read the Agreement. A reasonable person must be charged with knowledge of a document with its magnitude and import. If not perused when signed, operative papers should be examined by the reasonable person very shortly afterwards. Many courts have suggested that plaintiffs are chargeable with knowl-

edge of the contents of public records, *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1170 (5th Cir. 1979), and cases cited therein, including documents as obscure as reports of the old Tariff Commission, *Willmar Poultry Co. v. Morton–Norwich Products, Inc.*, 520 F.2d 289, 295 (8th Cir. 1975); S.E.C. and New York Stock Exchange releases. *Arneil v. Ramsey*, 550 F.2d 774, 781 (2d Cir. 1977); and Congressional hearings, *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 391 (6th Cir. 1975). Surely a plaintiff should be expected to apprise himself of the contents of an agreement he signed and helped to negotiate, and which sold out his interest in a company he helped to build. At the very latest, Campbell should have discovered the text of the merger documents in November of 1971 when he retained counsel, one Ronald C. Sharp, to secure the release of the escrowed shares. Although Sharp was not asked "to review the entire merger," he was informed of the "broad circumstances," shown the merger documents, and made aware of the supposed "back end" payment. Campbell Dep. at 89–91. Apparently Sharp did not report the terms of the contract to Campbell. Campbell should have instructed his attorney to review the Agreement for substance and report its contents to him.

## C. Upjohn's Acts of Concealment

The variance between Upjohn's original representations and terms of the perfected Agreement, and Upjohn's continuing assurances up to the day of signing (assuming them to be as Campbell alleges), cannot by definition constitute affirmative acts to conceal the original scheme, as they were part of it. Campbell makes no suggestion that Upjohn barred his access to copies of the Agreement; indeed, he must have had a copy to show to Sharp in November of 1971. The activity that Campbell claims prevented him from discovering the alleged scheme sooner is a series of representations by Upjohn officers and agents that his "back end" payment would be forthcoming in July of 1975. These included assurances by Wilsmann, in his capacity as President of the Homemakers successor corporation, and by Upjohn general counsel Gerard Thomas and Upjohn staff attorney Tom Mansanger. Campbell Aff. ¶¶ 9–11; Campbell Dep. at 71, 73.

## D. Reasonable Inferences from Known and Imputed Facts

Had Campbell never read the Agreement, a number of "storm warnings" should have been signalled by what he did know. There were only two types of "back end" payment discussed, one tied to an employment incentive contract, and the other to a buy–out of interest in the successor Homemakers. The first was instantly precluded when Campbell was forced to resign. The second went by the boards when Campbell exchanged all his Homemakers shares for Upjohn stock, rather than convert six of them into a 5.4% interest in the successor corporation. Simple deduction would have led Campbell to realize that neither discussed mechanism for making a "back end" payment was possible.

Other opportunities for discovery were declined when the Agreement was left unread for almost six years, and when Sharp failed to inform Campbell of its terms. One would suppose that the surprise resignation demand would have excited Campbell's curiosity, if not suspicion, about the deal he had struck. Yet he preferred to believe that his discharge was due to his false resume claim of college education, and simply "wasn't thinking about" its implications for the other assurances on which he relied. Campbell Dep. at 82–83, 85.

In light of what Campbell knew, and what he should have realized, Upjohn's occasional assurance that the "back end" payment would be made in 1975 should not have interfered with his discovery of the alleged scheme. The assurances may be nothing more than mere denials of wrongdoing that do not rise to acts of fraudulent concealment; even if so, they could readily have been verified by reference to the Agreement. Campbell dealt with Upjohn at arms–length, and it had no fiduciary obligation to protect his interest or divulge

its fraud. Wilsmann, as Campbell's former close colleague, might have been more candid; but he too had no special legal tie that required him to step forward. (He finally did so in June of 1975. Campbell Aff. ¶ 12.) Campbell's physical and mental difficulties may well have been caused by the shock of the closing events, and may have even postponed the time when he should have learned of the alleged scheme, but they cannot operate to require a lower level of diligence than that expected of a reasonable person. Whatever Campbell's condition, he was sufficiently recovered by November of 1971 to retain counsel, journey from Connecticut to Upjohn headquarters at Kalamazoo, Michigan, and confront Upjohn over the escrow arrangements. Surely by then he had sufficiently gathered his wits to finally examine the documents he knew he had signed. The Court can only conclude that the plaintiff had sufficient reason to inquire into the underlying facts, and so discover his cause of action, no later than November of 1971. The statute of limitations on his claim thus expired in November of 1973, almost two years before he initiated this suit. The Court must therefore grant summary judgment to the defendant under Fed.R.Civ.P. 56.

The statute of limitations sometimes operates to produce the harsh result of slamming the courthouse door to a sorely aggrieved citizen with a worthy claim. Yet it is established law founded in sound policy, and this Court must abide by it. Scott Campbell had many opportunities to discover and press his lawsuit within the prescribed time. Perhaps he was a devastated man fearful of confirming his situation, and so too willing to accept a disingenuous claim that all was well. Unfortunately for him the law required that he more actively look after his own interests.

MOTION FOR SUMMARY JUDGMENT IS GRANTED.

IT IS SO ORDERED.