Woodrow E. WILSON, et al.

v.

H.J. WILSON CO., INC., et al.

Civ. A. No. 80–103–A.

United States District Court,
M.D. Louisiana.

April 16, 1982.

Thomas E. Balhoff, Judith Atkinson Chevalier, Baton Rouge, La., for plaintiffs.

Robert E. Barkley, Jr., Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, La., for defendants.

JOHN V. PARKER, Chief Judge.

FINDINGS OF FACTS AND
CONCLUSIONS OF LAW

The complaint alleges a claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.-10(b)(5), and pendent state law claims under the Louisiana Stock Transfer Act and a claim for fraud under Louisiana law. By stipulation of the parties, this matter was separately tried by the court without a jury on January 26, 1982 on the issue of prescription. Pursuant to Rule 52(a), F.R.C.P., the court renders the following findings of fact and conclusions of law on the issue of prescription.

FINDINGS OF FACT

1. Plaintiff Woodrow Wilson has been a general contractor on a full time basis since

1962 and, prior to that, on a part time basis since 1956.

2. Defendant Huey Wilson is the founder and Chairman of the Board of H.J. Wilson Co., Inc., which operates a chain of catalog showrooms.

3. The first catalog showroom was incorporated in Baton Rouge, Louisiana in 1958. The second catalog showroom was incorporated separately in Jackson, Mississippi in 1961. The third catalog showroom was incorporated separately in Gulfport, Mississippi in early 1965.

4. Huey Wilson and his wife, Angelina Wilson, owned all the stock in the Baton Rouge and Gulfport stores, except a small number of shares irrelevant to the issues of this lawsuit.

5. Plaintiff Woodrow Wilson, who is Huey Wilson's brother, contributed $10,000 to the Jackson store when it opened, and Woodrow was issued 100 shares of stock in the Jackson corporation. In early 1965, 600 shares of capital stock of the Jackson corporation were issued in the name of Huey, 100 shares were issued in the name of Woodrow, and 100 shares were issued in name of George Wilson, another brother. There were no other shareholders of the Jackson corporation at that time.

6. During the first part of 1965, Huey decided to reorganize the ownership of the three stores under one corporation, which was accomplished for purchasing, accounting and financing reasons.

7. A stock for stock agreement dated July 1, 1965 was signed by the former shareholders of the three stores. Under that agreement all of the capital stock of the three stores was transferred to a corporation known as Wilco, Inc., and the capital stock of Wilco was issued to the former shareholders of the three stores.

8. As a result of that reorganization, Woodrow was issued stock certificate no. 8 of Wilco for 202 shares.

9. The original allocation of Wilco shares among the three brothers was based on the book value of the three different corporations in 1965. Huey in 1969 instructed Stanley Villavaso to recompute the allocation because Huey thought that the Jackson store had been over valued in relation to the Baton Rouge store. As a result of this recalculation, Villavaso concluded that Woodrow and George should each transfer 79 shares to Huey.

10. Wilco stock certificate numbers 14 and 15, dated February 24, 1970, in the amount of 123 shares and 79 shares respectively were issued to Woodrow. Woodrow signed the back of stock certificate no. 15 in the amount of 79 shares. His endorsement is dated February 24, 1970. It reflects that those 79 shares were assigned to Huey.

11. The court finds that Woodrow must have known what he was signing, since the printed certificate clearly states on front and back that it is a stock certificate in Wilco and the endorsement on the back, which Woodrow signed, clearly states that Woodrow assigns the shares to Huey.

12. Subsequent to the February, 1970 transfer by Woodrow, Huey instructed Villavaso to reallocate the shares again because he felt that the Jackson store (in which Woodrow and George were stockholders) had received too much credit for earnings of the Gulfport store in the 1965 allocation. As a result of those computations, Villavaso concluded that Woodrow and George should each transfer 35 additional shares of Wilco to Huey.

13. Woodrow signed the back of stock certificate no. 14 for 123 shares. His endorsement is dated February 15, 1971. It reflects that 35 shares were assigned to Huey. The court finds that Woodrow knew that he was assigning these 35 shares to Huey.

14. Wilco, Inc. stock certificate no. 23, dated February 15, 1971, in the amount of 88 shares was issued to Woodrow.

15. On February 24, 1971, a merger was effected whereby the Baton Rouge, Jackson and Gulfport corporations were merged into Wilco, Inc. and the name of the company was changed to H.J. Wilson Co., Inc. At the same time, the stock was split 203-for-1 based upon the ownership as of the close of

business on February 15, 1971. The meeting at which these transactions occurred was pursuant to notice mailed to shareholders prior to the meeting. Prior to that meeting, Woodrow received notice of the meeting and of those proposed transactions.

16. Shortly after receiving notice of the 203-for-1 stock split, Woodrow calculated that after the 203-for-1 stock split, 202 pre-split shares would be 41,006 shares.

17. In early April, 1971, after the 203-for-1 stock split Woodrow received H.J. Wilson Co., Inc. stock certificate no. 31 for 17,776 shares together with the following letter (dated April 1, 1971):

"The Corporation is pleased to enclose certificate number 31 for 17,776 shares of the Common Stock of H.J. Wilson Co., Inc., registered in your name. The enclosed shares have been issued pursuant to a 203-shares-for-1 share stock split approved by the Shareholders at a meeting held on February 24, 1971. Prior to such stock split 88 shares were registered in your name. Those shares, together with the shares enclosed herewith, total 17,864 shares, which is the total number of shares of which you are the holder of record, according to the stock records of the Corporation."

18. In June, 1971, H.J. Wilson Co., Inc. had a public offering of shares of its stock at $14.00 per share. By the end of that year, the price of the stock had risen to more than $30.00 per share.

19. After the public offering in August, 1972, Woodrow discussed with Huey and Stanley Villavaso, the company's chief financial officer, the number of shares of stock Woodrow held. Woodrow admits that Villavaso showed him the working papers upon which the allocation of shares was based and reviewed the figures with him but denies that he understood them. Woodrow also admits that the figures did not "tie in" and that he still asserted that he ought to have 79 additional "pre-split" shares. After the discussions, Huey transferred to Woodrow and to George the equivalent of ·35 pre-split shares each. Huey testified that he did this only "to keep peace in the family."

20. Later that same year, Woodrow again complained to Huey that he ought to have more shares and Huey flatly told him that no additional shares would be issued to him, despite Woodrow's threat to hire an attorney.

21. After that retransfer of the equivalent of 35 pre-split shares from Huey to Woodrow, Woodrow was aware that he had the equivalent of 123 pre-split shares of stock. He was also aware at that time, that the shares of stock on which he received the 203-for-1 stock split were 79 shares less than the 202 shares he had been issued in Wilco in 1965 and that he thought he was entitled to the additional 79 shares.

22. At about this time (late 1972) Woodrow told George that Huey had stolen Wilco stock from him (Woodrow).

23. Woodrow consulted an attorney regarding this matter in 1979. Through his attorney, a request was made for stock records of H.J. Wilson Co., Inc. regarding the history of Woodrow's stock ownership in the company. Those records were promptly furnished through the company's attorney.

24. This lawsuit was filed on February 25, 1980.

25. The claim asserted by plaintiff in this case is that he was entitled to receive and should have received the equivalent of 202 pre-split shares of H.J. Wilson Co., Inc. (Wilco), but that he received the equivalent of only 123 pre-split shares, and that he is entitled to receive the equivalent of an additional 79 pre-split shares.

## CONCLUSIONS OF LAW

The Securities Exchange Act of 1934 contains no limitation period that is expressly applicable to claims under § 10(b) and Rule 10 b–5 promulgated pursuant thereto (17 C.F.R. § 240.105) nor does federal law prescribe any general statute of limitations for civil actions. Consequently, the limitation period which the forum state applies is the state remedy which bears the closest substantive resemblance to Rule 10b–5 and which best effectuates its pur-

pose. *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir.1974); *Nortek, Inc. v. Alexander Grant & Co.*, 532 F.2d 1013 (5th Cir. 1976).

In *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.1977), the court found a close analogy between Rule 10b–5 and the Louisiana Blue Sky statute, La.-R.S. 51:715 A(3) and E holding that the Louisiana statute:

"... promotes the full and accurate disclosure of information in connection with stock sales, precisely the same purpose as that of Rule 10b–5. There are two differences between the section and the Rule: The Louisiana law prohibits only misrepresentation by sellers, and it measures the conduct of defendants against a negligence standard of care. Even with these distinguishing features, however, the Blue Sky statute still bears a closer resemblance to Rule 10b–5 than a catch-all provision dealing with the variety of offenses and quasi offenses in the Louisiana Code. Accord, *Hudak v. Economic Research Analysts, Inc.*, 5th Cir. 1974, 499 F.2d 996, cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821; ..." 551 F.2d at 1024 n. 31.

The present action is for fraudulent inducement in the transfer of stock in that defendant falsely stated the nature of the transaction plaintiff entered into when he signed the stock certificate. Plaintiff claims that he was induced to sign the stock certificate by Huey's misrepresentation that the papers were just something necessary as a preliminary step to going public. These transfers were part of the 1965 exchange of stock wherein plaintiff exchanged his stock in the Jackson store for stock in Wilco, Inc. which was a holding company for all three stores.

Accordingly, the two year limitation period established by the Louisiana Blue Sky law applies to this action. *Cowsar v. Regional Recreations, Inc.*, 65 F.R.D. 394 (M.D. La.1974); *B. Rosenberg & Sons, Inc. v. St. James Sugar, etc.*, 447 F.Supp. 1 (E.D.La. 1976).

Plaintiff's argument that the ten year period established by Article 3544 of the Louisiana Civil Code for bringing personal actions should apply, is not persuasive.

While federal courts look to state law to determine the applicable limitations period, the question of when a cause of action accrues, and thus when the limitations period commences to run, is governed by federal law. *Vigman v. Community National Bank & Trust Co.*, 635 F.2d 455, 458–59 (5th Cir.1981); *Rawlings v. Ray,* 312 U.S. 96, 61 S.Ct. 473, 85 L.Ed. 605 (1941); *Azalea Meats, Inc. v. Muscat*, 386 F.2d 5 (5th Cir.1967). A cause of action under § 10(b) and Rule 10b–5 accrues when the aggrieved party has either actual knowledge of the violation or notice or facts which, in the exercise of due diligence, would have led to actual knowledge. *Vigman,* supra at 459, *Azalea,* supra at 8–9, *McNeal v. Paine, Webber, Jackson & Curtis, Inc.*, 598 F.2d 888 (5th Cir.1979).

Plaintiff claims that he did not have actual knowledge of the alleged violation of law by his brother, Huey, until March, 1979 when H.J. Wilson Co., Inc. sent corporate records which Woodrow's attorney had requested by letter of March 8, 1979. This date is not controlling. The more appropriate inquiry is, "when did plaintiff have notice of facts which, in the exercise of due diligence, would have led to actual knowledge."

Plaintiff, conceding that actual knowledge is not required, nevertheless argues that prescription should not start to run in this case until 1979 because a fiduciary relationship existed between Huey and Woodrow, because Huey concealed the fraud by telling his brother that he could not get to the records at that time, because Woodrow was not a corporate insider and thus could not obtain the company stock records without Huey's cooperation, and because Woodrow was not sophisticated in corporate affairs and stock transfers. The court notes that these factors are set out in *Dupuy v. Dupuy,* supra, as part of the merits of a 10b–5 action. These factors go toward determining whether the carelessness of a plaintiff should preclude his recovery on the

merits. They do not relate to determination of the commencement of the limited period.

In *Sleeper v. Kidder, Peabody & Co., Inc.,* 480 F.Supp. 1264 (D.Mass.1979), aff'd 627 F.2d 1088 (1980), the First Circuit set out succinctly the standard for determining whether plaintiff had notice of facts which, in the exercise of due diligence, would have led to actual knowledge and thus to the running of the limitation period:

"Once facts have accumulated that would, in the ordinary investor, excite inquiry into the possibility of fraud, the duty to exercise reasonably diligence in uncovering the fraud is triggered...

The rule thus has two components. It begins with the ordinary investor—the standard against which we test whether sufficient facts were available at the time to trigger inquiry notice. Once on notice, the investor is then under a duty to exercise due diligence in making a further investigation into those facts." 480 F.Supp. at 1269.

The Fifth Circuit has adopted this standard. See *First Federal S. & L. Ass'n of Miami v. Mortgage Corp., Etc.,* 467 F.Supp. 943 (N.D.Ala.1979), aff'd, 650 F.2d 1376 (5th Cir.1981); *Vigman v. Community Nat. Bank & Trust Co.,* 635 F.2d 455 (5th Cir. 1981).

Defendant argues the letter of April 1, 1971 put plaintiff on notice of facts (that he only had 88 shares in Wilco, Inc. which were converted into H.J. Wilson Co., Inc. stock) which in the exercise of due diligence, would have led to actual knowledge of the alleged fraud, and the court agrees. Woodrow testified that after he received the letter of April 1, 1971 he knew something was wrong. After this, in 1972, Woodrow claims to have started asking Huey to show him the records so he could determine what was wrong, and it was in late 1972 that Woodrow reviewed that "work papers" with Villavaso, that Huey transferred 35 shares back to Woodrow, that Huey flatly told him that he had all the shares he was going to get and that Woodrow told George that Huey had stolen stock. Woodrow was clearly in possession, at least in 1972, of facts which would excite inquiry into the possibility of fraud and raise the duty of the investor to exercise due diligence to make further investigation into those facts. Plaintiff then had two years, the applicable prescriptive period, in which to make further investigation to uncover the alleged actual fraud and to bring a timely action. This he has failed to do. The complaint was filed February 25, 1980, well outside the two year limit, and prescription has run.

In summary, the court holds that the applicable prescription period for a Rule 10b-5 action is two years as stated in the Louisiana Blue Sky Laws, prescription started to run in 1971 or 1972 and has in fact run.

The court's next inquiry is whether the state pendent claims should also be dismissed.

In the leading case, *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court set out the basic principles which should be applied where federal and state claims are presented together:

"Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 86 S.Ct. at 1139.

In *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), in a three-judge-court context, the court held that mootness of the federal constitutional question did not deprive the court of power to hear pendent nonconstitutional claims.

In *Pharo v. Smith,* 621 F.2d 656 (1980), the Fifth Circuit held that it is within the discretion of the district courts to dismiss pendent claims without prejudice when the federal claims are dismissed before trial, but noted on rehearing:

 

"That a plaintiff's state law claims will be time-barred if dismissed is certainly a factor, if not a determinative factor, a district court should consider in deciding whether to maintain jurisdiction over pendent state claims once the federal claims have been resolved." 625 F.2d 1226, 1227 (5th Cir.1980).

The court also commented upon *Rosado v. Wyman:*

"In *Rosado,* substantial time and energy had been expended, and the state law issue was 'essentially one of federal policy [where] the argument for exercise of pendent jurisdiction is particularly strong.' Id. [397 U.S.] at 403–404, 90 S.Ct. at 1213, quoting *United Mine Workers v. Gibbs,* 383 U.S. at 727, 86 S.Ct. at 1139. Thus, where the federal jurisdictional base is lost after trial or after a substantial part of the case has been completed, the trial court may still retain a pendent state-law claim. *Florida East Coast Railroad v. United States,* 519 F.2d 1184 (5th Cir. 1975)." 621 F.2d at 675.

In *Tinker v. DeMaria Porsche-Audi, Inc.,* 632 F.2d 520 (5th Cir.1980), the court stated:

"Once the district court properly dismissed Tinker's federal claims, its exercise of pendent jurisdiction over Tinker's state claims lay within the court's discretion. *In Re Carter,* 618 F.2d 1093 (5th Cir.1980). In exercising that discretion, some of the factors the district court should consider are 'whether the federal claims were dismissed before trial, whether the state claims predominate, whether the state claims are closely tied to questions of federal policy, and whether the jury is likely to be confused by the treatment of divergent legal theories of relief.' " 632 F.2d at 523.

■ Here the federal cause of action will be dismissed before trial on the merits, and the state claims do not dominate since fraud is encompassed in the federal statute. Although the state claims are closely tied to federal policy, demanding truth in the sale of securities, the state must enforce the same policies in upholding the state cause

of action. If the pendent state claims are dismissed, plaintiff will not be prejudiced since a state action was filed at the same time the federal action was filed. Because the federal cause of action is time-barred and must be dismissed, the state claims will be dismissed without prejudice. In accord, *Prince v. Wallace,* 568 F.2d 1176 (5th Cir. 1978) and *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111 (5th Cir.1979).