Sterling and Esther JENSEN

v.

George M. SNELLINGS, III, et al.

Civ. A. No. 81–3729.

United States District Court,
E.D. Louisiana.

May 29, 1986.

John J. Cummings, III, Richard Martin,
New Orleans, La., for plaintiffs.

Ewell E. Eagan, Jr., Gordon, Arata, McCollam & Stuart, New Orleans, La., for Granada defendants.

W.P. Anderson, Hammett, Leake & Hammett, New Orleans, La., for George Snellings, III.

Jack M. Weiss, Brent B. Barriere, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Samuel Bradshaw & E.F. Hutton & Co.

J. Walter Ward, Jr., Kevin R. Tully, Christovich & Kearney, New Orleans, La., for defendants Snellings, Breard, Sartor, Inabnett & Trascher.

## MINUTE ENTRY

ROBERT F. COLLINS, District Judge.

This case is before the Court on Motion for Summary Judgment by defendants, Snellings, "Snellings, Breard," Granada, Bradshaw and E.F. Hutton. Defendants seek dismissal of plaintiffs' RICO claim on the basis that it has prescribed.

The history of this case can be traced back to mid–1977, when plaintiffs, Sterling and Esther Jensen, received approximately $4.4 million from the proceeds of the sale of a communications business owned by her family. Although "unsophisticated, unknowledgeable, and untutored in financial matters" (Plaintiffs' Complaint, paragraph 13), the Jensens sought to invest the funds in a manner designed to minimize their income tax liability. Defendant George M. Snellings, III, a member of the Monroe, Louisiana law firm of Snellings, Breard, Sartor, Inabnett & Trascher, had represented members of Esther Jensen's family and knew of the Jensens' investment needs. Snellings furnished plaintiffs' names to defendant, Samuel Bradshaw, an employee in the Dallas, Texas office of E.F. Hutton & Company, Inc. Bradshaw proposed that the Jensens invest in certain "tax shelter" securities, namely cattle feeding agency agreements being offered by defendant, Granada Financial Services, Inc., a wholly-owned subsidiary of defendant, Granada Corporation. Snellings persuaded the Jensens to purchase more than $2 million of cattle with $800,000 of their own funds and bank loans in excess of $1.2 million. Snellings, on Esther Jensen's behalf, executed a cattle feeding agency agreement with Granada Financial on August 25, 1977. The venture allegedly resulted in substantial losses for the Jensens.

The Jensens filed suit on September 15, 1981, contending that their investments failed because of a series is misrepresentations by defendants, Snellings, "Snellings, Breard," Granada, Bradshaw and E.F. Hutton. Plaintiffs alleged *inter alia* that all defendants, acting singularly or in concert, violated and conspired to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) and thereby also violated 18 U.S.C. § 1962(d).[1] Plaintiffs' claims for civil damages under RICO were originally dismissed by Judge Lansing L. Mitchell of this Court on July 30, 1982. Footnote 2 of Judge Mitchell's Minute Entry stated the grounds for the ruling:

> This Court is in total agreement with the holding of Judge Sear of this Court in the *Waterman Steamship* case in which he held that the history of RICO revealed a "clearly expressed legislative intent that [RICO] should apply only to actions involving organized crime activities, and not to everyday private litigants with no relation to organized crime."

Thus, Judge Mitchell's ruling relied on *Waterman Steamship Corporation v. Avondale Shipyards, Inc.*, 527 F.Supp. 256 (E.D.La.1981), for the proposition that a civil RICO claim requires a criminal predi-

---

1. 18 U.S.C. § 1962

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section. Added Oct. 15, 1970, P.L. 91–452, Title IX, § 901(a), 84 Stat. 941.

cate act. The case was later transferred to this section of the Court. Plaintiffs filed a motion to reconsider Judge Mitchell's ruling which this Court denied.

Now before the Court is plaintiffs' Second Motion to Reconsider Judge Mitchell's dismissal of their RICO claims. The plaintiffs argue that *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), revives their RICO cause of action by eliminating the requirement of a criminal predicate. The Supreme Court in *Sedima* specifically rejected the notion that a RICO case can only be brought against a defendant with a criminal history. It is now clear—and somewhat controversial—that RICO can be applied to so-called legitimate businesses. As the Fifth Circuit has commented:

> The scope of the civil RICO statute is breathtaking. An allegation of fraud in a contract action can transform an ordinary state law claim into a federal racketeering charge. It may be unfortunate for federal courts to be burdened by this kind of case, but it is not for this Court to question policies decided by Congress and upheld by the Supreme Court.

*R.A.G.S. Couture, Inc. v. Mary M. Hyatt and Oren M. Welborne*, 774 F.2d 1350 (5th Cir.1985). In light of *Sedima*, this Court now GRANTS plaintiffs' Second Motion to Reconsider their RICO claims. In addition to ruling on whether plaintiffs' RICO claims have prescribed, the Court will also consider whether plaintiffs' claims under Section 10(b) of the Securities Exchange Act have prescribed.

The Court begins with the proposition that there is no express statute of limitations for civil actions under RICO. Nor do federal securities laws specify limitation periods applicable to implied causes of action under Section 10(b) of the Securities Exchange Act and Rule 10(b)–5 promulgated thereunder.[2]

■ Congressional silence on the limitations period forces federal courts to borrow the limitations period from the state statute which bears the closest substantive resemblance to the federal cause of action. *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Wood v. Combustion Engineering, Inc.*, 643 F.2d 339 (5th Cir.1981); *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.1977). "The implied absorption of state statutes of limitation within the interstices of the federal enactments is a phase of fashioning remedial details where Congress has not spoken but left matters for judicial determination within the general framework of familiar legal principles." *Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). In *Del Costello*, the United States Supreme Court stated: "[T]here is not always an

2. Section 10(b) of the Securities Exchange Act states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

June 6, 1934, c. 404, Title I, § 10, 48 Stat. 891. Rule 10(b)–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

(Sec. 10; 48 Stat. 891; 15 U.S.C. § 78j)

[13 FR 8183, Dec. 22, 1948, as amended at 16 FR 7928, Aug. 11, 1951]

obvious state-law choice for application to a given federal cause of action; yet resort to state law remains the norm for borrowing of limitations periods." 103 S.Ct. at 2294. Thus, the Court in the case at bar must refer to Louisiana law to fill the limitations gap in RICO and federal securities law.

 In order to determine an applicable prescriptive period, courts must first determine the character or nature of the obligation sued upon. *Lazard v. Boeing Company*, 322 F.Supp. 343 (E.D.La.1971). The plaintiffs' complaint alleges securities violations; thus, the Louisiana Blue Sky Law [3] applies to the federal securities claims. This Court held on February 8, 1984 that the two-year prescriptive period borrowed from LSA–R.S. 51:715(E) [4] will govern those causes of action.[5]

The U.S. Court of Appeals for the Fifth Circuit has accepted the Louisiana Blue Sky Law as the state action most closely resembling rule 10(b)–5. *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.1977); *Vigman v. Community National Bank & Trust Co.*, 635 F.2d 455 (5th Cir.1981); *Nortek, Inc. v. Alexander Grant & Co.*, 532 F.2d 1013 (5th Cir.1976); *Hudak v. Economic Research Analysts, Inc.*, 499 F.2d 996 (5th Cir.1974); *White v. Sanders*, 650 F.2d 627 (5th Cir.1981); *First Federal Savings and Loan Association of Miami v. Mortgage Corporation of the South*, 650 F.2d 1376 (5th Cir.1981). *See also, Wilson v. H.J. Wilson Co., Inc.*, 563 F.Supp. 10 (M.D.La. 1982). Although there are differences between the Louisiana statute and the SEC rule, they prohibit the same conduct: fraud in the sale of securities. Both statute and rule deal expressly with the sale of securities and are joined by an "undeniable commonality of purpose." *White v. Sanders*, 650 F.2d 627 (5th Cir.1981). This commonality of purpose between Rule 10(b)–5 and state blue sky laws has influenced courts outside the Fifth Circuit to hold that the Blue Sky statute is the state action which most closely resembles 10(b)–5 and that the Blue Sky statute of limitations should apply to 10(b)–5 actions. *See, e.g., O'Hara v. Kovens*, 625 F.2d 15 (4th Cir.1980) (applied Maryland Blue Sky statute of limitations to 10(b)–5 action noting, "[t]he federal and state securities laws both promote the same policy of full disclosure in stock transactions. This commonality of purpose overrides lesser distinctions which may arise in the implementation of the regulatory schemes"); *Morris v. Stifel, Nicolaus & Co., Inc.*, 600 F.2d 139 (8th Cir.1979) (applied Missouri Blue Sky Law stating, "there is a distinct commonality shared by section 10(b) and a state's blue sky statute"); *Forrestal Village, Inc. v. Graham*, 551 F.2d 411 (D.C.Cir.1977); *Schaefer v. First National Bank of Lincolnwood*, 509 F.2d 1287 (7th Cir.1975) (10(b)–5 and Illinois Blue Sky statute have "a nearly identical aim"); *In re Alodex Corporation*, 533 F.2d 372 (8th Cir.1976). Accordingly, plaintiffs' federal securities claims are governed by the two-year prescriptive period of the Louisiana Blue Sky Law.

---

**3.** La.Rev.Stat.Ann. § 51:715 A(3) (West 1952). Section 715 A(3) provides in relevant part, as follows:

> Any person who: (3) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying the security from him, who may sue at law to recover the consideration paid for the security, together with interest at six percent per year from the date of pay-ment, cost, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.

**4.** La.Rev.Stat.Ann. 51:715(E) (West 1952). Section 715(E) provides in relevant part, "No person may sue under this section more than two years after the contract of sale."

**5.** This ruling was made by Judge Henry Mentz, Jr. of this Court, who later recused himself from this case.

■ Moreover, the Court finds that the two-year standard of LSA–R.S. 51:715(E) applies to the RICO claim. The alleged RICO violation and the cause of action under Section 10(b) of the Securities Exchange Act are based on the same facts. Essentially, the plaintiffs have presented the Court with a securities case although brought in part under RICO. The marriage between RICO and Section 10(b) is a function of contemporary securities practice.[6] Thus, the same two-year limitations period will govern the RICO and securities claims in the case at bar.

■ The two-year limitations period begins to run when the aggrieved party has "either actual knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof." *Vigman v. Community National Bank & Trust Co.,* 635 F.2d 455, 459 (5th Cir.1981). The plaintiffs argue that the "actual knowledge" prong of the *Vigman* test is the controlling standard. They contend that the limitations period did not begin to run until the victims of concealed fraud, the Jensens, had *actual* knowledge of the identity and roles of the participants in the fraud. The plaintiffs correctly note that the limitations period is tolled so long as the fraud is concealed from the victim.[7] However, it is tolled only until the date when the victim obtains sufficient information which warrants further inquiry.

A cause of action accrues at the time when the plaintiff in the exercise of reasonable diligence discovered or should have discovered the acts constituting the alleged fraud. *Arneil v. Ramsey,* 550 F.2d 774 (2d Cir.1977); *Hilton v. Mumaw,* 522 F.2d 588 (9th Cir.1975); *Cook v. Avien, Inc.,* 573 F.2d 685 (1st Cir.1978). The limitations period is triggered by the discovery of facts which would cause a reasonable man to inquire whether he has suffered a legal

wrong. The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing. Knowledge of *all* facts is not required to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses "storm warnings," *Cook v. Avien, Inc.,* 573 F.2d 685 (1st Cir.1978), not when he hears thunder and sees lightning.

The statute of limitations contemplates notice inquiry. *See, Vigman,* 635 F.2d 455 (5th Cir.1981). As Judge Wisdom of the Fifth Circuit has stated: "Those who have learned of facts 'calculated to excite inquiry' must inquire." *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148 (5th Cir.1979), quoting *Clement A. Evans & Co. v. Mc Alpine,* 434 F.2d 100 (5th Cir.1970). Once a plaintiff has, or ought to have, knowledge of facts from which wrongdoing could reasonably be inferred, "he must attempt to ferret out the whole truth." *Campbell v. Upjohn,* 498 F.Supp. 722 (W.D.Mich.1980). Thus, the Court must determine when the Jensens had notice of facts which imposed a duty to inquire whether they were the victims of a fraudulent securities scheme.

Summary judgment is appropriate in a civil action in which there is no genuine issue as to any material fact, thus entitling one of the parties to judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure. The particular facts of the case, as reflected in the complaint and other evidentiary matters, determine whether the Court should grant the motion for summary judgment. *See, First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). All reasonable doubts regarding the existence of a genuine issue of material facts must be resolved in favor of the party opposing the motion. *United States v. An Article of Food Consisting of 345/50–lb. Bags,* 622 F.2d 768 (5th Cir.1980). The

---

**6.** See *James and Kokko v. Meinke,* 778 F.2d 200 (5th Cir.1985) [Sec. 10(b) elements used to establish predicate offenses of securities fraud required for liability under RICO].

**7.** The doctrine of fraudulent concealment operates to toll the statute of limitations where the

victim of fraud "remains in ignorance of it without any fault or want of diligence or care on his part ..." *Cook v. Avien, Inc.,* 573 F.2d 685 (1st Cir.1978); *Bailey v. Glover,* 88 U.S. (21 Wall) 342, 22 L.Ed. 636 (1875).

Fifth Circuit has accepted summary judgment as a method for ruling on a statute of limitations defense. *Vigman, supra.* After considering the complaint, numerous motions, depositions and affidavits, the Court finds that the following material facts are undisputed.

The Jensens first became aware of problems with their cattle investment in March of 1979. Although Samuel Bradshaw of Hutton told the Jensens they had a profit for the year, the Jensens received a letter written by George Snellings, their attorney, to Granada in which Snellings stated that the Jensens had lost $25,000. Concerned that their investment had not reaped expected profits, the Jensens contacted Sam Gilmore, a representative of the bank which had financed the cattle agreements. Gilmore advised the Jensens that their investment had not been profitable.

On March 16, 1979, Sterling Jensen visited Granada's offices to meet with David Eller, Granada's President, and to discuss the status of the Jensens' investment. Eller told Jensen that their loss was about $300,000. He advised Jensen that Granada was responsible for the selection of cattle, management and feeding, and that Snellings had not performed these services as he had represented to the Jensens.

The Jensens were "very concerned" about their cattle investments, and they strongly doubted whether Snellings performed the services he claimed. *See,* Esther Jensen Dep. at 80; Sterling Jensen Dep. at 222–24. In early April, 1979, Sterling Jensen wrote to Eller that Snellings was "building his illusion still that he personally oversaw every function of the cattle business." S. Jensen Dep. at 217–19. Jensen further complained that Bradshaw should have advised him of Snellings' conduct. However, Bradshaw had "continued the myth George was working his ass off on our behalf." *Ibid.* Bradshaw attempted to blame Granada, apparently telling Esther Jensen that Granada may have done something "criminal."

David Eller referred the Jensens to Sewell & Riggs, a law firm in Houston, Texas. Walter Weathers, an associate with the firm, was asked to "investigate the entire program" and "to find out the truth." S. Jensen Dep. at 103; E. Jensen Dep. at 58. During April, May and June, 1979, Weathers conducted an extensive investigation of the Jensens' investment. Although Weathers did not specifically investigate Granada and Hutton, he reviewed materials provided to him by Granada. He also interviewed Eller and other Granada employees. Weathers Dep. at 70–71, 84. Weathers drafted a thirty-five page, single-spaced memorandum concerning the Jensens' investment in June, 1979.

Weathers' memorandum discussed, in part, the financial status of the Jensens' investment. Weathers retained an accountant to determine the extent of the Jensens' loss. Based on information provided by the accountant, Weathers advised the Jensens that they had lost nearly $300,000 during the first year of the program and an additional $67,000 during the second year. Weathers also discussed Snellings' activities on behalf of the Jensens and concluded that Snellings had not been actively involved in the management of the cattle program as he had been previously represented to the Jensens. In this regard, Weathers wrote that "Granada was hired to accomplish all tasks necessary to the proper management of the cattle programs" and that Snellings was "a novice in the cattle feeding field" who was unqualified to manage the Jensens' investment. The memo also discussed Hutton's interest in the cattle investments. It noted that Granada had purchased a feed yard in Clovis, New Mexico, from Hutton and that Hutton had underwritten the private placement of the cattle feeding program to insure that Granada was able to pay for the feed yard. Weathers' memo mentioned fees Hutton received from the cattle feeding agreement. It notes that "Hutton was to receive a 6% fee of all 'equity' invested in the program and $1.00 of each $5.00 paid to Granada as a management fee." The Weathers' memorandum advised the Jensens that they might have a legal action in connection with their investment and referred to "claims," "recovery" and "causes of action."

The Jensens received and reviewed the Weathers' memorandum in mid-July, 1979. Both of the Jensens made extensive notes on the memorandum. Esther Jensen noted that Snellings' description of his activities was "absurd," a "con job," a "hoax" and a "sheer fabrication." She characterized Snellings' fee as a "swindle" and referred to Snellings as a "scoundrel" and a "menace" whose performance was a "federal offense." Snellings, Esther Jensen wrote, "didn't care about my equity," acted "against expert advice" and was now attempting to "cover ineptness." In late July, 1979, the Jensens visited Weathers' office to discuss the memorandum and his investigation of the cattle investment. The Jensens provided Weathers with a list of questions relating to their investment. Sterling Jensen also wrote a letter to David Eller in July, 1979, in which he described the Weathers' memorandum as the basis for a "case" and as material for consumption by a "jury."

The Jensens now attempt to downplay the significance of the Weathers' memorandum. They suggest that Weathers wrote a second memorandum in October, 1979, because they did not understand the June memorandum. They further contend that the first memorandum did not specify a securities-based legal theory, nor did it seek to expressly scrutinize the behavior of Granada, Hutton and Bradshaw. Thus, plaintiffs ask this Court to accept October, 1979 as the time in which the limitations period began to run.

█ The Court holds as a matter of law that the Weathers' June memorandum, as viewed in the totality of the circumstances, provided the "storm warnings" which triggered the limitations period in July, 1979. Awareness and knowledge involve an objective standard. *Hupp v. Gray*, 500 F.2d 993 (7th Cir.1974). The question must be asked: What facts would alert a reasonable person to the possibility of wrongdoing? *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340 (8th Cir.1980). Investors are not free to ignore warning signals which would cause a reasonable person to "ferret out the whole truth." *Campbell v. Upjohn Co.*, 498 F.Supp. 722 (W.D.Mich.1980).

Thus, the Court finds the Jensens by July, 1979 either had "notice or should have been on notice of facts which, in the exercise of due diligence, would have led to actual knowledge" of the alleged wrongful acts. *Vigman, supra* at 459.

█ The limitations period may run notwithstanding the plaintiffs' failure to recognize that they may have a legal claim. *Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir.1980). In *Holmes v. Bateson*, 583 F.2d 542 (1st Cir.1978), the First Circuit rejected the district court's ruling that the statute did not begin to run until plaintiff's attorney revealed the fraud to the plaintiff. In *Vigman*, Judge Jerre S. Williams stated:

> [W]e reject appellants' contention that their causes of action did not accrue until they specifically learned from their lawyer ... that they might have a cause of action against the Bank and Bache. The knowledge, whether actual or constructive, which an aggrieved party must have for the purpose of the commencing of the running of a statute of limitations is merely that of 'the *facts* forming the *basis* of his cause of action,' (emphasis added), not that of the existence of the cause of action itself. [citation omitted].

*Vigman*, 635 F.2d at 459. Therefore, the limitations period can be triggered before an attorney explicitly informs his client that a cause of action exists.

█ Moreover, Weathers' knowledge and understanding of the relevant facts is imputed to the Jensens through the attorney-client relationship. The knowledge of an agent is imputed to the principal. *Weingart v. Delgado*, 204 La. 752, 16 So.2d 254 (1943). The laws of agency apply to the attorney-client relationship. *Marpco, Inc. v. South States Pipe & Supply*, 377 So.2d 525 (La.App. 3rd Cir.1979). In *Dandorph v. Fahnestock*, 462 F.Supp. 961 (D.Conn.1979), the court found that the plaintiff should have become aware of defendant's alleged securities violation at least as of the date her former attorney wrote a letter to the defendant setting forth plaintiff's complaints. The attorney did not mention the possible claim to the plaintiff. The court held that the attor-

ney's knowledge is imputed to the plaintiff so that she knew or reasonably should have known of the situation at least as of the date of the attorney's letter. In the case at bar, Weathers' research revealed many of the facts forming the basis of the Jensens' complaint. The Court concludes that the Jensens' attorney acquired knowledge of the facts before September, 1979.

In sum, the Court adopts the two-year limitations period of the Louisiana Blue Sky Law. The Court finds that the Jensens either had notice or should have been on notice by July, 1979 of the alleged wrongful acts. Since the two-year limitations period began to run in July, 1979, and the plaintiffs' complaint was not filed until September 15, 1981, the plaintiffs' First and Second Causes of Action are time barred. Accordingly, the Court GRANTS the defendants' Motions for Summary Judgment on the RICO and Section 10(b) claims.