C. Rush McINNIS, et al.

v.

MERRILL LYNCH, PIERCE, FENNER
& SMITH, et al.

No. 3–87–0062.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 16, 1992.

Ames Davis, Robert Earl Boston, Waller, Lansden, Dortch & Davis, Nashville, TN, Alex S. Lacy, J. Vernon Patrick, Patrick & Lacy, Birmingham, AL, Thomas H. Peebles, III, Trabue, Sturdivant & DeWitt, Nashville, TN, Patricia McGee, Michael Edwards, Balch & Bingham, Birmingham, AL, for plaintiffs.

David Creswell Andrew, Leonard Hearne Armistead, III, Baker, Worthington, Crossley, Stansberry & Woolf, Nashville, TN, N. Lee Cooper, A. Inge Selden, III, Maynard, Cooper, Frierson & Gale, Birmingham, AL, James L. Priester, Leo M. Bearman, Roy Keathley, Huskill, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, TN, Ellen Hobbs Lyle, Trabue, Sturdivant & DeWitt, Nashville, TN, Patricia McGee, Michael Edwards, Balch & Bingham, Birmingham, AL, for defendants.

## MEMORANDUM

HIGGINS, District Judge.

The Court has before it the motions to dismiss of the defendants, Merrill Lynch, Pierce, Fenner & Smith; Sandestin Beach Hotel, Inc.; and Frank L. Flautt, Jr., made orally on October 30, 1991, after the close of the plaintiffs' proof. Merrill Lynch filed a contemporaneous written motion to dismiss (Docket Entry No. 446).[1] Also before the Court are the plaintiffs' response to motion to dismiss of defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (filed October 29, 1991; Docket Entry No. 448), and Merrill Lynch's reply brief in support of motion to dismiss (filed November 12, 1991; Docket Entry No. 450).

For the reasons discussed below, the Court grants the defendants' motions to dismiss plaintiffs' federal and state securities claims, state fraud claims, and breach of fiduciary duty claims on statute of limitations grounds. The Court grants the defendants' motions to dismiss plaintiffs' breach of contract claim on its merits.[2]

### I. FACTS AND PROCEDURAL HISTORY[3]

This action was filed originally on October 31, 1986, in the District Court for the Northern District of Alabama. It was transferred to this Court on January 21, 1987, by order of the Honorable Seybourn H. Lynne, Senior Judge for the Northern District of Alabama. It is a class action[4] in which the plaintiffs allege violations of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b–5 promulgated thereunder, the Florida Securities Act (Fla.Stat. § 517.301), fraudulent misrepresentation and deceit under Alabama state law (Ala.Code § 6–5–104), and breach of contract and breach of fiducia-

---

1. Defendants SBH and Flautt rely on their oral motions and arguments.

2. The Court does not address the plaintiffs' negligence claim, which is asserted solely against the defendant Laventhol & Horwath. This claim has been severed and all proceedings against Laventhol & Horwath have been stayed while the defendant is in bankruptcy. *See* order entered November 27, 1990 (Docket Entry No. 262).

3. The Court will summarize the necessary facts underlying this action. For a more detailed description of the facts and the principal parties,

see the prior opinion in this case, *McInnis v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1355 (M.D.Tenn.1989), and in the companion case, *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1309 (M.D.Tenn. 1989). *McInnis* and *Nichols* were consolidated for pre-trial purposes, but not for trial.

4. The class was conditionally certified by order entered May 18, 1987 (Docket Entry No. 22). The order approving notice to the class members was entered August 11, 1987 (Docket Entry No. 32).

ry duty.[5] The Court has jurisdiction over the federal securities claims pursuant to 28 U.S.C. § 1331, 15 U.S.C. §§ 77v and 78aa, and 18 U.S.C. § 1964. The Court has pendant jurisdiction over the state law· claims.

At issue are hotel interests[6] which the plaintiffs purchased in the Sandestin Beach Hilton, a resort hotel on Florida's Gulf Coast. The hotel is fifteen stories high and has 400 guest rooms. It was developed by the defendant Sandestin Beach Hotel, Inc. (SBH). Frank Flautt was, at all times material to this case, a shareholder, director, and president of SBH. The hotel interests were sold exclusively by Merrill Lynch for SBH.

Most of the investors were "accredited investors," as determined by Regulation D of the Securities Act of 1933, with a net worth in excess of one million dollars or a gross income of at least $200,000 for the years 1981 and 1982, and with anticipated income at least equal to that in 1983. Confidential private placement memorandum at 1, plaintiffs' trial exhibit no. 2A. A few investors did not meet this high qualifying criteria, but were screened by Merrill Lynch using financial information provided by the potential investor.[7] Merrill Lynch, Pierce, Fenner & Smith, Inc.'s proposed findings of fact and conclusions of law at 3 (received August 30, 1991). The hotel interests were sold based on the representations in a Private Placement Memorandum, a copy of which each investor received at or before the time he signed the Unit Sales Agreement (through which he contracted to buy the hotel interest). The PPM was issued, and the hotel interests were offered for sale, on February 9, 1983. All of the plaintiffs signed their respective Unit Sales Agreements on or before April 25, 1983. No investor exercised his right to cancel the contract within fifteen days of executing the Unit Sales Agreement. *See* Unit Sales Agreement at para. 10, plaintiffs' trial exhibit no. 3; PPM at 37; Merrill Lynch's proposed findings of fact at 27.

The plaintiffs allege essentially that the defendants omitted to disclose, or misrepresented, material facts with regard to: (a) the townhouses which were subsequently built on land adjacent to the hotel site, the ownership of that adjacent land, and the effect of the townhouses on views from the hotel rooms; (b) the developer's profits; (c) the structure of the offering; and (d) the inflation projections in the PPM. Plaintiffs' trial brief and proposed findings of fact and conclusions of law at 3–5 (filed August 30, 1991; Docket Entry No. 421). Before trial, the defendants filed various motions for summary judgment and to dismiss, which the Court denied. *See McInnis v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1355, 1359–60 (M.D.Tenn.1989). Primarily, for purposes of this memorandum, the Court denied Merrill Lynch's motion to dismiss on statute of limitation grounds because there were "disputed factual questions." *Id.* at 1357. Trial before the Court began on September 23, 1991, and continued through the close of plaintiffs' proof on October 28, 1991. On October 30, 1991, the defendants moved to dismiss pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.

## II.  DISCUSSION

■  When considering a defendant's motion to dismiss under Rule 41(b)[8] "for insuffi-

---

5.  The securities and fraud causes of action are alleged against all of the defendants. The breach of contract cause of action is alleged solely against SBH. The breach of fiduciary duty cause of action is alleged only against SBH and Frank Flautt.

6.  The parties have stipulated that "[t]he Hotel Interests are securities for purposes of the federal Securities Exchange Act of 1934." Stipulations at para. 9 (filed September 3, 1991; Docket Entry No. 423).

7.  The PPM provided that a non-accredited investor must (1) have a net worth of $250,000 *and* a gross income in 1981 and 1982 in excess of $125,000 and expect gross income in excess of $125,000 in 1983; *and* (2) "must either alone or with his Purchaser Representative, have such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment." PPM at 1. *See also* Merrill Lynch trial exhibit no. 546, confidential purchaser questionnaire.

8.  Rule 41(b) provides, in pertinent part:

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of the evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for

ciency of the plaintiff's evidence it becomes the duty of a court to weigh and evaluate the evidence." *Weissinger v. United States*, 423 F.2d 795, 798 (5th Cir.1970). "Moreover, in evaluating the evidence, the judge makes no special inferences in favor of the plaintiff." *Hersch v. United States*, 719 F.2d 873, 876 (6th Cir.1983). The defendants have moved to dismiss this case on the grounds that the plaintiffs failed to file within the applicable statutes of limitations and failed to prove the essential elements of their claims. *See e.g.,* Merrill Lynch's motion to dismiss. The Court will discuss the defendants' statute of limitations arguments first, since if they prevail on those arguments, there will be no need for the Court to address the sufficiency of the plaintiffs' proof.

## A. *Applicable Statutes of Limitation*

### *(1) Securities Exchange Act of 1934*

■ "It has long been settled that an action under SEC Rule 10b–5 is available to private plaintiffs." *Nichols v. Merrill Lynch, Pierce, Fenner & Smith*, 706 F.Supp. 1309, 1318 (M.D.Tenn.1989) (citations omitted). Until recently, however, there was no federal statute of limitations in securities cases. A federal court generally borrowed the most closely analogous state statute of limitations from the state in which it sat. *See e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668, 686 n. 29 (1976); *Carothers v. Rice*, 633 F.2d 7, 12 (6th Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1702, 68 L.Ed.2d 199 (1981). All of this was to change when the Supreme Court decided *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

In *Lampf,* the Supreme Court announced a statute of limitations for actions under section 10(b) and Rule 10b–5 consisting of a "1–year period after discovery combined with a

3–year period of repose." *Id.* at ——, 111 S.Ct. at 2780, 115 L.Ed.2d at 334. The Court reasoned that, although "[i]t is the usual rule that when Congress has failed to provide a statute of limitations for a federal cause of action, a court 'borrows' or 'absorbs' the local time limitation most analogous to the case at hand. . . . [t]he rule . . . is not without exception." *Id.* at ——, 111 S.Ct. at 2778, 115 L.Ed.2d at 331 (citations omitted). Therefore, finding that federal law provided a closer analogy than state law, and that a uniform national standard was preferable, *id.* at ——, 111 S.Ct. at 2778–79, 115 L.Ed.2d at 332–33, the Court borrowed the "1–and–3–year structure [found] in the [1934] Act's original remedial provisions." *Id.* at ——, 111 S.Ct. at 2781, 115 L.Ed.2d at 335. The Court applied the newly-announced rule retroactively to the parties in the case before it. *Id.* at ——, 111 S.Ct. at 2782, 115 L.Ed.2d at 336–37.

On the same day the Supreme Court decided *Lampf,* it also decided *James B. Beam Distilling Co. v. Georgia*, 501 U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), in which it retroactively applied the rule in another case to the litigants in the case before it.[9] In the wake of the decisions in *Lampf* and *James Beam,* many pending cases alleging violations of section 10(b) and Rule 10b–5 were dismissed on statute of limitations grounds. Although many of these cases may have been filed timely under the then existing statutes of limitations, they were no longer timely under *Lampf*'s one-and-three year configuration.

After a considerable outcry, Congress effectively overruled the Supreme Court's retroactive application of *Lampf* by enacting section 1126(a) of the Comprehensive Deposit Insurance Reform and Taxpayer Protection Act of 1991, Pub.L.No. 102–242, § 27A, 105 Stat. 2236, 2387 (1991). The Act provides in

a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. Fed.R.Civ.P. Rule 41(b).

9. In three separate opinions, six justices agreed on the retroactive application of the rule established in *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) that a state statute imposing a higher excise tax on liquor imported from outside the state than on liquor originating within the state violated the Commerce Clause of the United States Constitution. *James Beam,* 501 U.S. at ——, 111 S.Ct. at 2441, 115 L.Ed.2d at 486.

relevant part that "[t]he limitation period for any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991."[10]

The Court is not persuaded by the defendants Flautt's and SBH's assertions purporting to challenge the constitutionality of the Act. Response of defendants Sandestin Beach Hotel, Inc. and Frank L. Flautt, Jr. in opposition to plaintiffs' motion for status conference at 2 (filed January 7, 1992; Docket Entry No. 456). Rather, the Court is convinced of the Act's constitutionality as applied to this case. *See Robertson v. Seattle Audubon Soc'y,* — U.S. —, —, 112 S.Ct. 1407, 1409, 118 L.Ed.2d 73, 79–80 (1992) (upholding the application of § 318 of the Department of the Interior and Related Agencies Appropriations Act to the case before the Supreme Court, which was enacted after the case had been filed, because the Act "compelled changes in law, not findings or results under old law"); *Threiber v. Katz,* 796 F.Supp. 1054, 1062 (E.D.Mich.1992) (finding the Act constitutional as applied to pending cases, but not "to the extent it seeks to reinstate § 10(b) claims that have already been subject to final adjudication...."); *Brown v. Hutton Group,* 795 F.Supp. 1307 (S.D.N.Y.1992) (finding that the Act "does not direct courts to make a specific factual finding or to apply a specific rule of decision to cases before it"). Therefore, as directed by Congress, the Court will apply the statute of limitations applicable to section 10(b) cases before the Supreme Court's decision in *Lampf.*

█ Although this Court usually would apply Tennessee law, this case was filed originally in the Northern District of Alabama. A transferee court must apply the law of the state in which the transferor court sits. *See McInnis,* 706 F.Supp. at 1357; *Campbell v. Upjohn Co.,* 498 F.Supp. 722, 726 (W.D.Mich. 1980), *aff'd,* 676 F.2d 1122 (6th Cir.1982). Therefore, the most closely analogous state-law statute of limitations is the Alabama two-

year blue sky limitations period. Ala. Code § 8–6–19(f) (1991); *Hunt v. American Bank & Trust,* 606 F.Supp. 1348, 1353 (N.D.Ala. 1985), *aff'd,* 783 F.2d 1011 (11th Cir.1986).

█ Although the Court must apply the state statute of limitations, federal law determines when the statute begins to run. *Campbell* 498 F.Supp. at 726. "The general rule is that a limitation period begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged fraud." *Id.* In other words, "what matters is not when the information was actually known, but rather when in the exercise of due diligence it should have been known." *Hunt v. American Bank & Trust,* 783 F.2d 1011, 1014 (11th Cir.1986). Applying these principles, the Court finds that the plaintiffs did not file this lawsuit in a timely manner. Therefore, their federal securities claims are time-barred and should be dismissed.

Plaintiffs essentially complain that the defendants made material misstatements and omissions of fact in the PPM regarding (a) the townhouses on an adjacent parcel of land, who would own that land, and their effect on views from hotel rooms; (b) the developer's profits; (c) the structure of the offering; and (d) inflation projections. Plaintiffs' trial brief at 3–5. For the plaintiffs' claims to be time-barred, the Court must find that the plaintiffs knew or should have known of the facts which constitute the alleged material misstatements or omissions of fact before October 31, 1984, two years before they filed suit. Each plaintiff received a copy of the PPM at or before the time he signed his Unit Sales Agreement. The last Unit Sales Agreement was signed on April 25, 1983. This lawsuit is being tried solely on the representations, or lack thereof, in the PPM.

### (a) The Townhouses

The PPM contained numerous disclosures and disclaimers regarding each of the specific misstatements or omissions of which the plaintiffs complain. First, with regard to the ownership of the land on which the townhouses sit, the PPM specifically stated that:

---

**10.** June 19, 1991 is the date of the Supreme Court's decisions in *Lampf* and *James Beam.*

*The Hotel will be built on a 9.5 acre site,* which includes 1.7 acres of non-buildable dunes preservation easement. *The site abuts the Gulf of Mexico on the south, a parcel reserved for future development on the west and further to the west the proposed Sandestin beach club . . ., the townhouse site and vacant land on the east . . .,* and a proposed golf course on the north at the southeastern corner of the Resort.

. . . .

*While the purchase price for the Hotel Interests will be used by SBH to acquire the townhouse site and the parcel to the west of the Hotel site, Investors will not acquire any ownership interest in such parcels.*

PPM at 16–17 (emphasis added). In addition, a map of the area on page 15 of the PPM showed the "SANDESTIN BEACH HILTON SITE," the site "RESERVED FOR ADDITIONAL DEVELOPMENT BY S.B.H.," and the "townhouse site" with their respective acreages of 9.5 acres, 3.77 acres, and 1.0 acre. (Capitalization and emphasis in original). The use of proceeds section of the PPM disclosed that the "developed land cost" would include "land cost of $5,700,000 *for the purchase of the site, the townhouse and the site reserved for future development by SBH,* site improvement costs of $1,039,500 and a capital contribution to Sandestin Corporation of $1,800,000." PPM at 8 (emphasis added). The investors were also told that "[t]he common elements [of the hotel in which they will have ownership rights] will include the land of 9.5 acres at the Hotel." PPM at 26. Nowhere were they told that they would own the townhouse site or the site reserved for future development.

The plaintiffs also argue that the townhouses affect the view of the Gulf of Mexico from the hotel rooms, and therefore, decrease the hotel's rental income. The brochure which accompanied the PPM promised the investors a "picturesque view of the Gulf of Mexico" from each of the 400 hotel rooms. Brochure, plaintiffs' trial exhibit 2B. It also described the resort as "overlooking the

seemingly endless stretch of sand dunes, wide beaches and the Gulf of Mexico—where the Sandestin Beach Hilton will be constructed, with each hotel room unit sharing this view." *Id.*

However, the PPM itself told the investors that "SBH reserves the right to construct eight townhouse non-rental-pool condominium units on the beach front east of the site. . . . The height of any buildings on the townhouse site is restricted to four floors." PPM at 16. Further, "[w]hile there are beach views from all Units, there are differences in Units based on height, location of balconies and view." *Id.* at 32. Also, while the brochure included an artist's rendering of the hotel, the PPM explicitly stated that "[t]here is no assurance that when completed the Hotel will look as portrayed in the renderings." *Id.* at 39. Finally, although the final plans for the townhouses had not been prepared when the PPM was issued, there is no doubt that the investors were apprised of the possibility of townhouses being built on the townhouse site.[11] The plans for the townhouses were finalized by July 1984, more than two years before plaintiffs filed suit. Merrill Lynch's proposed findings of fact at 13.

### (b) Developer's Profits

Plaintiffs next argue that the PPM did not disclose adequately the total compensation and benefits received by SBH. Plaintiffs' trial brief at 20. Essentially, however, plaintiffs' argument is that the information is not disclosed in "a single location in the offering documents to facilitate scrutiny of the merits (or 'fairness') of the offering" as is the "standard custom and practice within the securities industry." *Id.* at 21.

The PPM does contain a section entitled "USE OF PROCEEDS," "SBH's and Affiliates' Profits and Benefits" which disclosed the "estimated compensation, fees, profits and other benefits which SBH and its affiliates may earn or receive from this Offering. . . ." PPM at 8. This section stated that SBH expected to receive $2,363,600 to

---

11. Plaintiffs Dr. Bruce Sullivan and Dr. Philip Watkins testified that when they bought their units they knew that there would be townhouses on the land to the east of the hotel. Trial testimony on October 21 and 22, 1991.

$4,863,600 in profits from the sale of the hotel interests. *Id.* The PPM qualified this profit expectation by adding that "[t]o the extent that these costs [outlined in this section] are lesser or greater than the amount estimated, SBH's profit will increase or decrease," *id.*, and "[t]he amount of profit will depend on the extent to which the $2,500,000 Operating Shortfall Escrow[12] is drawn upon." *Id.* at 9. This section also stated that an affiliate of SBH's, Sandestin Innkeepers, Inc., would receive management fees, and that Flautt & Mann Properties, Inc. (or another affiliate of SBH) would receive $1,600,000 "[f]or project development supervision and direction." *Id.* at 8–9.

In addition, elsewhere in the PPM, potential investors were told that they would not acquire any ownership rights in the townhouse site and the site reserved for future development, although their purchase money would be used to buy those sites. *Id.* at 17. Investors were told also that the project's developed land cost of $8,539,500 "[i]ncludes land cost of $5,700,000 for the purchase of the site, the townhouse and the site reserved for future development by SBH, site improvement costs of $1,039,500 and a capital contribution to Sandestin Corporation of $1,800,000." *Id.* at 8.

#### (c) Structure of the Offering

Plaintiffs also allege that "[t]he offering was structured in an unusual way in order to maximize Merrill Lynch's and the developer's profits, and because the developers could not obtain permanent financing." Plaintiffs' trial brief at 40. However, upon reading the PPM, potential investors were made aware of the structure of the offering, as well as the potential benefits to them and to the defendants.

The offering was structured as the sale of "400 Hotel Interests, each consisting of a fully furnished nonresidential hotel accommodation condominium Unit of The Sandestin Beach Hilton, a percentage ownership interest in the common elements of the Hotel including the fee simple interest in the land on which the Hotel is situated, and a mandatory Management Agreement." PPM at 2. SBH made available "financing for up to 90% of the purchase price of the Hotel Interest to purchasers who qualify under [Dominion Federal Savings & Loan Association's] requirements...." *Id.* at 38. The PPM clearly stated that "[t]he investor shall be responsible for obtaining any financing necessary for the purchase of the Hotel Interest[, and] [t]he cost of obtaining the commitment for the financing will be paid by SBH out of the offering proceeds." *Id.* Investors could choose to pay cash, finance up to ninety percent through Dominion Federal, or seek their own financing.

As discussed above, the PPM disclosed the structure of the offering, SBH's anticipated profits, what the investors were to pay, and what they would receive for their money. It also disclosed that Merrill Lynch was being paid "a commission of nine percent of the selling price of the Hotel Interests plus an expense allowance of one percent of such selling price." *Id.* at cover page. In addition, the PPM stated that, should SBH develop the land reserved for future development, SBH would have to pay approximately $14,000 per unit to Sandestin Corporation for building rights, and $5,000 per unit to the investors. *Id.* at 16–17.

#### (d) Inflation Projections

Plaintiffs' final contention regarding the PPM is that it "contained misleading and insupportable projections of the Hotel's performance for the years 1985 through 1989." Plaintiffs' trial brief at 27. Plaintiffs essentially argue that the projections "were misleading because they were unduly optimistic and were based upon increasing room rates arrived at by using inflation rates that were unreasonable and insupportable in view of the actual inflation rates prevailing at the time of the offering." *Id.* at 4. Again, however, much was disclosed in the PPM about

12. The operating shortfall escrow was established as a back-up fund for the investors in the event the hotel did not meet projected income during its first five years of operation. The money was taken from SBH's profit margin, and was to be returned to SBH, to the extent it had not been distributed, at the end of the five years. *See* PPM at 31. The entire escrow was paid out to the investors in 1985 and 1986 when the hotel failed to meet income projections. Merrill Lynch's proposed findings of fact at 16.

the projected inflation figures from which plaintiffs could have learned of the defendants' alleged fraud had they been so inclined.

SBH hired Laventhol & Horwath, a nationally-known accounting firm with expertise in the hotel industry at the time of the offering, to prepare projections for the hotel. L & H prepared a market study report on the proposed hotel dated April 28, 1982. The objectives of the market study included determining the feasibility of the hotel, commenting on the most appropriate type of operation, and projecting occupancy and room rates. PPM at I–2. On November 11, 1982, L & H "conducted a limited review of the economic and market factors affecting the proposed project to ascertain if any significant changes in these factors have occurred since April 28, 1982 that may have a material effect on the proposed project." *Id.* at I–1. L & H concluded that "[n]othing has come to our attention that would cause us to believe that any significant change in the economic and market factors has occurred ... that may have a material effect on the proposed project." *Id.*

L & H projected occupancy and average room rates for 1985 of 55 percent and $89.30; for 1986 of 58 percent and $97.35; for 1987 of 61 percent and $106.10; for 1988 of 63 percent and $115.65; and for 1989 of 65 percent and $126.05. *Id.* at I–3. It did so based on inflation rates projected by L & H to reach twelve percent in 1983, ten percent in 1984, and nine percent annually in each of the years 1985 through 1989. *Id.* However, the PPM warned prospective investors that

> [t]he projected inflated average room rates could be materially different if significantly higher or lower rates of inflation are actually experienced. Since the actual rates of inflation cannot be predicted with any de-

gree of certainty, no assurance is given that the projected average room rates will not vary materially from those shown above.

*Id.* L & H further warned that, "[s]ince the projected mathematical models are based on estimates and assumptions, which are inherently subject to uncertainty and variation depending upon evolving events, we do not represent them as results that will actually be achieved." [13] *Id.* at I–4. In fact, Schedule IV of the PPM illustrated the effects on investors' income of reductions in occupancy and room rates. *Id.* at IV–1.

From the foregoing discussion, it is obvious to the Court that the plaintiffs' federal securities claims are time-barred and should be dismissed.[14] The plaintiffs possessed ample information before October 31, 1984, from which, using reasonable diligence, they should have been put on at least inquiry notice of the facts underlying the defendants alleged fraud. The plaintiffs were not passive, limited partners, but rather, active investors in the condominium project. They were also sophisticated investors who had amassed large net worths and had substantial incomes. And, the PPM warned them of the risks inherent in investing in the offering. Taking all the circumstances into account, the Court is convinced that these plaintiffs did not take advantage of the knowledge available to them, and therefore allowed the limitations period to run.

### (2) Florida Securities Act

The same facts which form the basis of plaintiffs' federal securities claim also form the basis of their state law securities claim. *See* complaint at paras. 88–90 (filed October 31, 1986). Before the Court can resolve whether the plaintiffs filed this claim in a

---

13. To the extent that L & H's projections were misleading, inflation rate information is readily available. In fact, Dr. Philip Watkins, a plaintiff in this case, testified that he reads Forbes magazine, the Wall Street Journal and the Sunday New York Times, that these publications provide information on inflation trends, and that he was aware of inflation trends at the time he purchased his unit. Trial testimony on October 22, 1991.

14. The Court has federal question jurisdiction over plaintiffs' claim under the Securities and Exchange Act of 1934. The Court has pendant jurisdiction over all the remaining claims. It is within the Court's discretion to dismiss the pendant claims for lack of jurisdiction once it has dismissed the federal claim. The Court declines to do so, however, because the entire matter has been explored at trial and the length of time it has been pending before the Court.

timely manner, it must determine the applicable statute of limitations.

Since the Court is sitting, in effect, as an Alabama court in this case, it must apply the statute of limitations that an Alabama court would apply. Generally, Alabama courts consider statutes of limitations to be procedural, and therefore do not apply another state's limitations period even when applying its substantive law. *See Sanders v. Liberty Nat'l Life Ins. Co.*, 443 So.2d 909, 912 (Ala. 1983). However, there are exceptions to this rule. The plaintiffs claim that the Florida securities law statute of limitations is part of a "statute of creation," and is "inextricably bound" to the statute. Plaintiffs' response to motion to dismiss at 2. Therefore, plaintiffs argue, Alabama courts would consider the statute of limitations to be part of the substantive law itself, and would apply it. *Id.* The defendants argue that the Florida statute of limitations is procedural, and not part of the statute of creation. Memorandum of Merrill Lynch, Pierce, Fenner & Smith, Inc. in support of its motion to dismiss at 10 (filed October 28, 1991; Docket Entry No. 447). Therefore, they argue that Alabama courts would apply the Alabama statute of limitations. *Id.*

■ The Court does not find it necessary to resolve the issue whether the Alabama courts would apply the Florida statute of limitations. The Court is convinced that under either statute of limitations, the plaintiffs have failed to file their action in a timely manner. Florida Statutes § 95.11(4)(e) provides:

> 95.11. Limitations other than for the recovery of real property.—
> Actions other than for recovery of real property shall be commenced as follows:
> (4) WITHIN TWO YEARS.—
> . . . .
> (e) An action founded upon a violation of any provision of part I of chapter 517, with the period running from the time the facts giving rise to the cause of action *were discovered or should have been discovered with the exercise of due diligence,* but not more than 5 years from the date such violation occurred.

(emphasis added). The applicable Alabama statute of limitations provides in pertinent part that:

> (f) No person may obtain relief under this section in any action involving the failure to register securities unless suit is brought within two years from the date of sale. *All other actions for relief under this section must be brought within the earlier of two years after discovery of the violation or two years after discovery should have been made by the exercise of reasonable care.*

Ala. Code § 8–6–19(f) (emphasis added). For the reasons discussed in the section dealing with the federal securities claims, under either state's statute of limitations, the plaintiffs failed to file within two years after they should have discovered the alleged violations which form the basis of this claim. Therefore, this claim should be dismissed as time-barred.

### (3) Alabama Fraud and Fraudulent Deceit

Plaintiffs next allege fraud and fraudulent deceit under Alabama Code § 6–5–104 (1991). This code section provides:

> § 6–5–104. Same—Fraudulent deceit.
> (a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.
> (b) A deceit within the meaning of this section is either:
> (1) The suggestion as a fact of that which is not true by one who does not believe it to be true;
> (2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;
> (3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or
> (4) A promise made without any intention of performing it.

*Id.*

■ Before the Court reaches the merits, the plaintiffs must have filed this claim be-

fore the tolling of the statute of limitations. The limitations period for an action under this section is two years from "the discovery by the aggrieved party of the fact constituting the fraud." Alabama Code § 6–2–3 (1991). "Discovery" of the fraud has been interpreted to mean either the actual discovery of the fraud, or when the fraud should have been discovered through reasonable diligence by the plaintiff. *First Fed. Sav. & Loan Ass'n v. Mortgage Corp.*, 467 F.Supp. 943, 953 (N.D.Ala.1979), *aff'd*, 650 F.2d 1376, 1378 (5th Cir.1981); *Batchelor v. Batchelor*, 502 So.2d 751, 753–54 (Ala.1987). " 'The question is not simply what facts the [plaintiff] actually knew, but of what facts might he have obtained knowledge had he sought it from the natural sources of information which were at his command.' " *Batchelor*, 502 So.2d at 754 (quoting *Taylor v. South & North Ala. R.R.*, 13 F. 152, 159 (M.D.Ala. 1882)).

As the Court has previously discussed, the plaintiffs should have discovered the alleged fraud more than two years before they filed suit. Therefore, their claims of fraud and deceit under Ala. Code § 6–5–104 are time-barred and should be dismissed.

*(4) Breach of Contract and Fiduciary Duty*

Plaintiffs' final claims are for breach of contract and breach of fiduciary duty. The contract claim is alleged solely against SBH. The fiduciary duty claim is alleged against SBH and Frank Flautt. The plaintiffs allege that SBH breached its contracts with them

> in that defendant SBH has erected a townhouse structure to the south of the Sandestin Beach Hotel and between the hotel and the Gulf of Mexico, which obstructs the view from many of the rooms in the hotel and which structure is not less than five (5) stories in height.

Complaint at para. 92. They allege that SBH and Frank Flautt breached their fiduciary duties to the plaintiffs "by erecting townhouses between the hotel and the Gulf of Mexico and of a height which obstructs the view from rooms in the hotel," thereby reducing the value of the hotel, the value of the interests in the hotel, and the rental income from the hotel. *Id.* at paras. 96, 97.

The contract between SBH and each plaintiff, the Unit Sales Agreement, specified that "[t]he parties intend this to be a Florida contract, [and] agree that it shall be construed pursuant to Florida law. . . ." Unit Sales Agreement at para. 21. Generally, Alabama "follows the principle of 'lex loci contractus,' which states that a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction." *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 506 (Ala.1991). Similarly, Alabama follows the rule of *lex loci delicti* in tort actions. *Fitts v. Minnesota Mining & Mfg. Co.*, 581 So.2d 819, 823 (Ala. 1991).

However, as previously discussed, Alabama courts apply the applicable Alabama statute of limitations, regardless of which state's substantive law is applied, unless the foreign state's statute of limitations is inextricably bound up in the statute creating the right. Neither party argues that Florida statutes of limitations apply to either the contract or fiduciary duty claim. Therefore, this Court, sitting, in effect, as an Alabama court, will apply the Alabama statutes of limitations.

The statute of limitations for actions based on contracts not under seal is six years. Ala. Code § 6–2–34 (1991). Therefore, the plaintiffs' claim for breach of contract is not time-barred. The statute of limitations for actions based on breach of a fiduciary duty is the same as for fraud. *See Davis v. Brown*, 513 So.2d 1001, 1004 (Ala. 1987) (citing *Jefferson County Truck Growers Ass'n v. Tanner*, 341 So.2d 485 (Ala. 1977)). Therefore, since plaintiffs did not file within two years of when they should have known of the defendant SBH's and Flautt's allegedly fraudulent acts, their breach of fiduciary duty claim is time-barred.

B. *Sufficiency of Plaintiffs' Evidence*

Having disposed of all of the plaintiffs' claims on statute of limitations grounds, except for the breach of contract claim, the Court will now address the merits of that claim. Plaintiffs' breach of contract claim is

premised on the allegation that SBH constructed townhouses more than five stories tall between the hotel and the Gulf of Mexico, thereby blocking the view of the beach and the Gulf from certain hotel rooms, contrary to the language in the PPM. Complaint at paras. 91–93; amended complaint at para. 4 (filed November 3, 1986).

The Unit Sales Agreement constitutes the contract in this matter. It "sets forth the entire agreement between the parties, superseding any and all prior understandings and agreements, and no oral representations or statements shall be considered a part of [the] Agreement." Unit Sales Agreement at para. 14. The Agreement incorporated by reference the provisions of the PPM. *Id.* at para. 22(g).

The brochure accompanying the PPM promised the investors a "picturesque view of the Gulf of Mexico" from every hotel room. Brochure, plaintiffs' trial exhibit 2B. It also described the Sandestin resort as "overlooking the seemingly endless stretch of sand dunes, wide beaches and the Gulf of Mexico—where the Sandestin Beach Hilton will be constructed, with each hotel room unit sharing this view." *Id.* However, the PPM itself cautioned the investors that "[w]hile there are beach views from all Units, there are differences in Units based on height, location of balconies and view." PPM at 32. Secondly, the PPM stated that "SBH reserves the right to construct eight townhouse non-rental-pool condominium units on the beach front east of the site.... The height of any buildings on the townhouse site is restricted to four floors." *Id.* at 16. Finally, the investors were warned that, although the PPM contains an artist's rendering of the hotel, "[t]here is no assurance that when completed the Hotel will look as portrayed in the renderings." *Id.* at 39.

In addition to the disclosures specifically relating to the view from hotel rooms, the PPM informed the investors that the "Hotel Interests are offered as business investments and should not be acquired for the purpose of using the Units as living or vacation accommodations." *Id.* at cover page (emphasis original). This admonition, placed on the first page of the PPM, is bolstered repeatedly throughout the PPM. The rooms were to "be assigned at random by SBH to the respective Investors when each Unit Sales Agreement is signed by SBH." *Id.* at 32. Therefore, no plaintiff can claim that he bought his unit in reliance on the view from a specific room. Also, to be eligible for the maximum tax benefits expected to be realized from the investment, no investor can stay in his unit more than fourteen days per year. *Id.* During that time, he pays his full share of the hotel's expenses, but does not share in the room revenue generated during his stay. *Id.*

Finally, income from room rental throughout the hotel is pooled, with each investor receiving his pro rata share. Since the hotel interests were purchased as investments, not as residences or vacation homes, *see* PPM at cover page, the view from any particular room is only material to the extent that it affects rental income. Although several individual plaintiffs testified that in their opinion the blocked views affect room revenues,[15] and two travel agents testified that in general rooms with better views rent at a higher rate,[16] the plaintiffs have not proven that rooms with views affected by the townhouses rent less frequently or at a lower rate than

15. *See e.g.,* trial testimony of Mr. Waldon Hamonds on October 21, 1991; Dr. Bruce Sullivan on October 21, 1991; and Dr. Philip Watkins on October 22, 1991.

16. *See* trial testimony of Ann C. West, and Donald L. Hawkins on October 22, 1991. Both Ms. West and Mr. Hawkins testified, not as fact witnesses, but as witnesses with special knowledge of the travel industry. Ms. West testified that occupancy, special rates, and floor, in addition to view, affect rental rates. She also testified that

she was not familiar with the Hilton rate system or with specific rates at this hotel. Mr. Hawkins also testified that room rates vary in general depending on the property, view from the room and location in the hotel. Mr. Hawkins was not familiar with the Hilton room rate schedule, either.

Significantly, neither witness testified that rooms at this hotel with blocked views rent less frequently or at a lower rate than other, similar rooms.

rooms on the other side of the hotel or higher up on the same side.[17]

For these reasons, the Court finds that SBH did not materially breach its contracts with the plaintiffs as it regards the views from the hotel rooms. Therefore, this claim must be dismissed on its merits.

## III. CONCLUSION

For the reasons discussed above, the Court grants the defendants' motions to dismiss made at the close of plaintiffs' proof. This action shall be dismissed with prejudice as to the defendants, Merrill Lynch, Pierce, Fenner & Smith; Sandestin Beach Hotel, Inc.; and Frank Flautt.

---

**17.** The parties dispute the actual height of the townhouses as built. The plaintiffs claim that they are more than five stories tall, while the defendants claim that they are four stories tall as promised in the PPM. The Court finds that the townhouses are five stories tall. For all intents and purposes, the top level sun deck and rooms containing electrical equipment are a story, if not living space. However, the Court finds that the height of the townhouses is only material to the extent that it effects rental income from the hotel. Since the plaintiffs have not proven that the townhouses affect room revenues, the fact that the townhouses are five stories tall and not merely four stories tall is not a material breach of the contract.